JACQUELINE ELLIG *et al.*, Indiv. and as Special Adm'rs of the Estate of Kathleen Ellig, Deceased, Plaintiffs-Appellees and Cross-Appellants, v. DELNOR COMMUNITY HOSPITAL, Defendant-Appellant and Cross-Appellee.

Second District   No. 2—91—1213

Opinion filed November 10, 1992.

David P. Meyer, of Hinshaw & Culbertson, of Lisle, and D. Kendall Griffith, of Hinshaw & Culbertson, of Chicago (Robert G. Black, of counsel), for appellant.

Patricia N. Hale, of Canel & Hale, Ltd., of Chicago (James H. Canel, of counsel), for appellees.

JUSTICE McLAREN delivered the opinion of the court:

This medical malpractice action was brought by Jacqueline and Scott Ellig, individually and as special administrators of the estate of Kathleen Ellig, deceased, against Delnor Community Hospital. Plaintiffs sought damages under the Wrongful Death Act (Ill. Rev. Stat. 1987, ch. 70, pars. 1, 2) and the Survival Act (Ill. Rev. Stat. 1987, ch. 110½, par. 27—6) for the death of their decedent, an undiagnosed twin. Following trial, a jury returned a verdict in favor of plaintiffs in the total amount of $879,519.35.

Upon defendant's post-trial motion, the Kane County circuit court reduced the total damage award to $866,415.35. On appeal, defendant asserts the following points of error: (1) that plaintiffs failed to prove conscious pain and suffering; (2) that the trial court failed to advise the jury of defendant's theory regarding sole proximate cause; (3) that plaintiffs failed to prove defendant proximately caused decedent's injury or death; (4) that the trial court failed to advise the jury of a directed finding; (5) that the trial court gave direct judicial recognition to a fact in controversy; (6) that the trial court gave erroneous instructions on the appropriate standard of care; (7) that misstatements of plaintiffs' counsel necessitate a new trial; and (8) that the Survival Act and Wrongful Death Act awards are excessive and require remittitur. Plaintiffs' cross-appeal asserts error in the trial court's reduction in the jury's original award. We reverse and remand.

On February 8, 1988, Jacqueline Ellig was admitted to Delnor Community Hospital because she was experiencing labor pains and was ready for delivery. During the course of this pregnancy, Jacqueline's weight had climbed from less than 120 pounds to 178 pounds. At 8:26 p.m., a baby boy was delivered. After placing the baby in an isolette for care and observation, Jacqueline's physician, Dr. Taylor, returned to Jacqueline for delivery of the placenta. After delivering the placenta, Dr. Taylor noticed that the abdomen was still larger than he had expected. Upon further examination, he discovered an undiagnosed twin.

Dr. Taylor checked the undiagnosed twin's position and found it presented head first, the normal position for a vaginal delivery. Dr. Taylor asked a nurse to listen for the baby's heart tones, ruptured the second water bag and attempted to deliver the second baby. However, the womb contracted causing a presentation of the baby unsuitable for vaginal delivery. Dr. Taylor then attempted to alter the baby's position in order to facilitate delivery. Dr. Taylor testified that his efforts lasted for approximately 10 to 14 minutes. Throughout this process, none of the nurses monitoring the baby's condition heard heartbeats. Moreover, the baby's muscles were flaccid and the baby did not respond to a pin prick on its finger or hand.

Dr. Taylor testified that it was his impression that the baby was stillborn, but that a cesarean section needed to be performed. He testified that, if he had heard heart tones, he would have gone ahead with a local anesthetic that was available and performed the cesarean section immediately. Because Dr. Taylor had not performed a cesarean section using a local anesthetic since 1967, and because he believed

the baby was not viable, he waited for the anesthesiologist to arrive before performing the cesarean section. Dr. Cha, an anesthesiologist, was notified of his needed presence in the delivery room, arrived after some delay, and administered spinal anesthesia at 9:23 p.m. The baby was delivered at 9:30.

Upon her delivery, Kathleen Ellig was found to have no spontaneous respirations and no cardiac function. Moreover, she lacked discernible muscle activity. Dr. Murphy, another physician present at the delivery, was able to reestablish the baby's heart function quickly, and, thus, opined that the baby probably had been without oxygen for approximately 10 minutes. It was Dr. Murphy's opinion that, at birth, Kathleen was tremendously stressed but that she was not an infant without life.

Dr. Cha intubated the baby by placing an endotracheal tube into the trachea in order to administer oxygen. This tube was placed into the baby's mouth, directed to the junction of the airway or esophagus, and inserted directly into the trachea. After five minutes of heart and respiratory treatment the baby still had no reflexes, respiration, or muscle tone. The doctors only first observed color in the baby after 10 minutes. The baby never started breathing on its own. She was subsequently transferred to Lutheran General Hospital for neonatal intensive care services. While the baby exhibited some gasping attempts at breathing, and twitching or seizure activity, her extremities were stiff. The baby never showed reflexes or responses to painful stimuli throughout her time at the hospital and transport.

The neurologist at Lutheran General Hospital concluded that the baby was incapable of surviving and recommended discontinuing treatment. Jacqueline and Scott Ellig agreed, and treatment was withdrawn on February 16, 1988. The death certificate indicated that an absence of blood supply to the brain and liver was among the causes of death.

Count II of plaintiffs' complaint alleged that Delnor (1) failed to provide anesthesia in a timely fashion; (2) failed to require anesthesia service to respond to the needs of obstetricians performing emergency cesarean sections; (3) failed to correct a right main stem intubation resulting in a collapse of the baby's lung; and (4) manipulated resuscitative equipment so as to cause a right main stem intubation. The jury awarded plaintiffs $162,500 for pain and suffering decedent experienced as a result of her injuries, $700,000 for the wrongful death of decedent, $16,880.35 for reasonable medical expenses incurred for care, treatment and services rendered to decedent, and $139 for burial expenses incurred. In its post-trial motion, defendant

asked that the award be reduced pursuant to section 2—1205 of the Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 2—1205), which allows reduction of a medical malpractice judgment by 100% of the benefits received for medical, hospital and nursing charges. The court granted this motion and reduced to $3,776.35 plaintiffs' recovery for medical expenses.

Defendant first argues that plaintiffs cannot recover damages under the Survival Act because they failed to prove conscious pain and suffering. We agree. While plaintiffs' medical experts in this case provided testimony about Kathleen's viability, their medical hypotheses failed to contradict sufficiently the eyewitness testimony that Kathleen was in an unconscious state from the time she was discovered until her subsequent death.

A survival action allows for the recovery of damages for injuries sustained by the deceased up to the time of death. (*Wyness v. Armstrong World Industries, Inc.* (1989), 131 Ill. 2d 403, 410.) According to *Murphy v. Martin Oil Co.* (1974), 56 Ill. 2d 423, a survival action acts to preserve rights of action for personal injury which accrued before the death of the injured person. In determining that a survival action may be had concurrently with a wrongful death action, the court noted the need to preserve causes of action relating to substantial loss of earnings, medical expenses, prolonged pain and suffering, as well as property damage sustained which would otherwise be extinguished upon the injured party's death. *Murphy*, 56 Ill. 2d at 431.

Subsequent decisions addressing a pain and suffering claim in a survival action have required the victims to have been conscious of their pain and suffering before succumbing to the injuries. For example, in *Maras v. Bertholdt* (1984), 126 Ill. App. 3d 876, we reversed a dismissal of an action alleging that decedent experienced pain and suffering in the context of an automobile accident. The trial court determined that no action could be had because there was either very little pain or suffering or that such pain and suffering only lasted for a very short period of time. On appeal, we explained that the duration of pain and suffering should determine the amount of, but not entitlement to, recovery. We further noted that, as a result of the dismissal, no evidence was introduced on the question of whether decedent was conscious for any period of time following the accident. (*Maras*, 126 Ill. App. 3d at 890.) Therefore, we remanded the case for reinstatement of plaintiff's complaint, which sought damages for decedent's pain and suffering which she experienced during a period of consciousness following the accident. (*Maras*, 126 Ill. App. 3d at 890.) Because the evidence in *Maras* indicated that decedent remained un-

conscious from the time she was found until the time she died in the hospital several hours later, we determined that "the maximum time period for which plaintiff could conceivably establish pain and suffering was from the time the accident occurred until she was located in the field approximately 20 minutes later." *Maras*, 126 Ill. App. 3d at 890.

In *Cooper v. Chicago Transit Authority* (1987), 153 Ill. App. 3d 511, the court held that evidence concerning decedent's injuries assisted the jury in determining if decedent felt any *"conscious* pain in order to recover under the Survival Act." (Emphasis added.) *(Cooper,* 153 Ill. App. 3d at 522.) In *Moore v. Swoboda* (1991), 213 Ill. App. 3d 217, the court stated that there are no Illinois cases requiring medical testimony establishing consciousness prior to death as a prerequisite to obtaining damages in a survival cause of action. Instead, lay testimony describing decedent's actions prior to death, together with evidence concerning the decedent's injuries, was sufficient to support a pain and suffering claim. In affirming the pain and suffering damages award, the court highlighted facts and evidence which indicated that decedent was conscious prior to his death. *(Moore,* 213 Ill. App. 3d at 235.) Likewise, in *Glover v. City of Chicago* (1982), 106 Ill. App. 3d 1066, the court explained that a claim for payments for damages arising from pain and suffering may be had where there is evidence indicating that decedent was conscious prior to her death.

■■ In light of these cases, we determine that consciousness is a requisite element of a complaint seeking recovery for pain and suffering. Furthermore, in presenting such a claim, the evidence involved must do more than provide mere speculation that the decedent was conscious and suffered pain. *(Bart v. Union Oil Co.* (1989), 185 Ill. App. 3d 64, 68.) In *Bart,* no witnesses testified to witnessing the decedent's pain and suffering. Instead, a pathologist testified that, based upon his knowledge of the relevant facts, the decedent *may* have survived an explosion and suffered pain prior to his death. The expert also testified that it was equally probable that no such suffering occurred prior to a second explosion. The court determined this testimony an insufficient basis to support a survival claim verdict awarding damages for pain and suffering.

In the present case, plaintiffs offered no testimony beyond mere speculation that the decedent/infant experienced any *conscious* pain and suffering during the time frame of the hospital's alleged tort. While there is no dispute between the experts in the case that an infant is capable of experiencing pain prior to birth, insufficient evidence was presented indicating that *this* infant actually experienced

such pain. Under these circumstances, the award for conscious pain and suffering below cannot be supported as against the hospital.

While Dr. Taylor attempted to manipulate the undiagnosed twin's position to facilitate vaginal delivery, efforts were made to assess the baby's condition using an external monitor sensitive to the baby's heartbeat. By the time Dr. Taylor concluded that he could not get the baby into the right position for delivery, he also knew no heart tones were being registered on the monitoring equipment. While trying to move the arm and hand of the undelivered baby, he received no responsive movement from the baby's fingers. Furthermore, the baby's arm did not have any muscle tone to it, the baby displayed no reflexes, and the baby did not respond when its finger was pricked with a small needle. Based upon these facts, Dr. Taylor believed that the baby was a stillborn.

Plaintiffs highlight testimony indicating that the baby was not a stillborn. For example, following delivery, her heart functions responded to resuscitation. Plaintiffs also highlight testimony that the baby was a viable infant capable of perceiving pain and that the oxygen deprivation causing her fetal distress probably was a competent source of pain. However, while these opinions may be valid in a general medical sense, they do not comport with the direct evidence on record indicating the baby's *lack of consciousness*. Indeed, for the remainder of her mechanically sustained life, Kathleen continued to lack muscle tone, responses to painful stimuli, and physical reflexes. Therefore, in light of plaintiffs' failure to prove consciousness of the decedent during the time frame of the hospital's alleged tort, the amounts awarded for pain and suffering must be reversed.

We next address defendant's claim that plaintiffs failed to establish that the alleged deviations from the standard of care by Delnor proximately caused the decedent's injury and death. Specifically, defendant asserts that the trial court erred in refusing a motion for directed verdict defendant made at the close of plaintiffs' case. This motion argued that plaintiffs failed to establish a causal link between the alleged deviations from the standard of care and the decedent's injury and death.

■ We determine that defendant's argument in this regard shall not be considered because it was not properly preserved in defendant's post-trial motion. (*Gerwig v. Bruere* (1989), 181 Ill. App. 3d 609, 613.) Supreme Court Rule 366(b)(2)(iii) states:

> "A party may not urge as error on review of the ruling on his post-trial motion any point, ground, or relief not specified in the motion." (134 Ill. 2d R. 366(b)(2)(iii).)

This rule is also reflected by section 2—1202 of the Code of Civil Practice which provides in part:

"Reserved ruling on motion for directed verdict—Post-trial motions in jury cases. (a) If at the close of the evidence, and before the case is submitted to the jury, any party moves for a directed verdict the court may (1) grant the motion or (2) deny the motion or reserve its ruling thereon and submit the case to the jury. *If the court denies the motion or reserves its ruling thereon, the motion is waived unless the request is renewed in the post-trial motion.*" (Emphasis added.) Ill. Rev. Stat. 1991, ch. 110, par. 2—1202(a).

Defendant here has failed in its post-trial motion to renew the motion for directed verdict on the issue of proximate cause with respect to the wrongful death of decedent. Therefore, defendant has waived its right to review the denial of the directed verdict below. (*American National Bank & Trust Co. v. J & G Restaurant, Inc.* (1981), 94 Ill. App. 3d 318.) It is not our function to correct those errors alleged on appeal which were not first presented to the trial court for its consideration. *Brown v. Decatur Memorial Hospital* (1980), 83 Ill. 2d 344.

Defendant next argues for a retrial on the grounds that the trial court refused defendant's instructions on sole proximate cause. We agree and find this error sufficiently prejudicial to warrant a new trial.

During the jury instruction conference, defendant tendered the long forms of Illinois Pattern Jury Instructions, Civil, Nos. 12.04 and 12.05 (3d ed. 1989) (hereinafter IPI Civil 3d) on proximate cause.

The long form of IPI Civil 3d No. 12.04 tendered by defendant provided:

"More than one person may be to blame for causing an injury. If you decide that the defendant was negligent and that its negligence was a proximate cause of injury to the plaintiff, it is not a defense that some third person who is not a party to the suit may also have been to blame.

However, if you decide that the sole proximate cause of injury to the plaintiff was the conduct of some person other than the defendant, then your verdict should be for the defendant." See IPI Civil 3d No. 12.04.

The long form of IPI Civil 3d No. 12.05 tendered by defendant provided:

"If you decide that a defendant was negligent and that its negligence was a proximate cause of injury to the plaintiff, it is

not a defense that something else may also have been a cause of the injury.

However, if you decide that the sole proximate cause of injury to the plaintiff was something other than the conduct of the defendant, then your verdict should be for the defendant." See IPI Civil 3d No. 12.05.

The trial court refused both of these instructions. Instead, the court accepted the short form of the instructions tendered by plaintiffs. Thus, the second paragraph of each instruction was excluded. As a result, the jury did not receive instructions with respect to the issue of sole proximate cause.

The notes to IPI Civil 3d Nos. 12.04 and 12.05 state that the second paragraph should be used only where there is evidence tending to show that the sole proximate cause of the occurrence was someone or something other than defendant. (IPI Civil 3d Nos. 12.04, 12.05, Notes on Use.) Defendant asserts that evidence *was* presented at the trial below which tended to show that Dr. Taylor, the physician who cared for Jacqueline, was the sole proximate cause of Kathleen's injuries. Therefore, defendant argues, the "Notes on Use" guidelines were satisfied and the long forms of Nos. 12.04 and 12.05 should have been tendered to the jury.

The general rule is that the court must instruct the jury on all issues reasonably presented by the evidence. (*Lounsbury v. Yorro* (1984), 124 Ill. App. 3d 745.) Each party is entitled to have a jury adequately instructed on his theory of the case and failure to do so may require a new trial. *Willhite v. Goodman* (1978), 64 Ill. App. 3d 273, 275.

■ In the present case, one of defendant's theories was that regardless of the timing of the arrival of anesthesia, the death of Kathleen was actually caused by the actions of Dr. Taylor. During closing arguments, counsel for defendant specifically stated that "it was in the hands of Doctor Taylor to have saved the baby." In large part, defendant argued that Dr. Taylor failed to act appropriately to save the baby by doing a cesarean under local anesthesia because he thought the baby was stillborn. Counsel for plaintiffs clearly recognized defendant's proximate cause theory as reflected by an in-chambers conversation in which he stated:

"MR. CANEL: I mean, your argument is a very simple argument. Your argument is that Taylor should have gone ahead with the local infiltrate. Sole proximate cause of the death of the baby.

406

MR. MEYER: And I should be able to explain why he should have done that.

MR. CANEL: No, he can explain it. He can explain it based on other findings in the record or other physical findings. He doesn't have to explain it in terms of Taylor. He can say 'cause I think it was a severe abruption and a severe abruption this baby was going to be compromised in five minutes or ten minutes or twenty minutes and etc., etc., etc.

MR. MEYER: That's what I'm getting at.

MR. CANEL: Well, then, do it that way.

MR. MEYER: I think that's what I am doing.

THE COURT: Well—

MR. CANEL: No, you're not.

THE COURT: I think you're directing it to this particular surgeon who performed this particular.

MR. CANEL: You want this jury to get the idea that it was Doctor Taylor's fault and Doctor Taylor should have done something different.

MR. MEYER: And I think I can do that.

THE COURT: But I would prefer that you do it in the abstract [sic]."

Plaintiffs countered that the delayed arrival of anesthesia was the cause of death. Dr. Gerbie, an expert testifying on plaintiffs' behalf, explained that, in his view, Dr. Taylor caused a partial abruption of the second twin's placenta when he tried to deliver the afterbirth of the first twin. Thus, Kathleen's placenta was partially separated from the mother's uterus with a resultant reduction of oxygen supply. Dr. Gerbie opined that this abruption increased in severity over time and resulted in the baby's cardiac arrest prior to the time of its delivery. Dr. Gerbie further opined that a 30- to 35-minute window of opportunity existed during which Kathleen could have been delivered with her heart beating and capacity to breathe intact. Plaintiffs' position was that by the time the hospital's anesthesiologist had arrived, this window of opportunity had closed.

This evidence, however, was rebutted by evidence presented at trial indicating that (1) the baby was not capable of supporting life at the time her existence was discovered and that (2) the actions of Dr. Taylor precluded all opportunities to preserve the baby's life in spite of any delay by the hospital in providing general anesthesia. With respect to the first proposition, this evidence was discussed earlier in the context of addressing the pain and suffering issue above. With respect to the second proposition, several points are relevant.

First, defendant's expert, Dr. Messitt, testified that obstetricians during 1988 regularly observed mothers in order to determine whether they were carrying twins. In the present case, Dr. Taylor never tested Jacqueline to discount the possibility of twins. Dr. Taylor testified, if he had known twins were present, he would have taken additional precautions ahead of time for delivery, including having anesthesia available when Jacqueline went into labor. This evidence indicates that a lack of proper diagnosis and failure to make proper arrangements may have been the sole proximate cause of the fatal injury rather than the hospital's delay in providing general anesthesia.

Second, even without discovering the existence of a twin by the time Jacqueline went into labor, Dr. Taylor removed the first baby's placenta. He did not check for a twin after delivery of Alexander, even though he admitted Jacqueline Ellig's abdomen still looked larger than normal. The testimony of those present indicated that Dr. Taylor had some difficulty delivering the placenta of the first baby. Dr. Taylor testified that had he known of twins ahead of time, he would not have delivered the placenta because placentas for twins may overlap. Other experts testified that removal of the placenta following birth of the first twin caused abruption of the placenta to the second child, leading to asphyxia and injury. Thus, Dr. Taylor's actions may have been the sole proximate cause of the fatal injury, regardless of the timing of anesthesia.

Third, Dr. Taylor may have been the sole proximate cause of the fatal injury by failing to deliver the decedent by cesarean under local anesthesia which was readily available. When nurses could not hear any fetal heart tones, and the baby failed to react to pin pricks, Dr. Taylor assumed the baby was stillborn or greatly stressed. He testified that he spent 10 to 14 minutes trying to manipulate the baby for vaginal delivery before requesting anesthesia. Experts testified that Dr. Taylor could have obtained a precise reading on the baby's heart activity to determine exactly the baby's condition by using an available electrocardiogram through an *internal* monitor, instead of the *external* listening device which was in fact used. Having properly assessed the baby's condition, defendant's expert opined that Dr. Taylor should have performed a cesarean within eight minutes by using local anesthesia, assuming the placenta of the second twin had separated from the wall of the mother's uterus. Thus, there was evidence that Dr. Taylor was the sole proximate cause of the fatal injury by delaying and not immediately performing a cesarean by local anesthesia to save a severely compromised child.

In light of the facts presented above, we determine that sufficient evidence was presented by defendant such that the trial court erred in not instructing the jury on the issue of sole proximate cause. We next must determine whether this error requires a retrial. We hold that it does.

An erroneous instruction requires a new trial when prejudice has resulted. (*Korpalski v. Lyman* (1983), 114 Ill. App. 3d 563, 568.) In *Korpalski*, prejudice was found where the erroneous instruction affected the jury's understanding of plaintiffs' burden of proof with respect to the issue of proximate cause. In making its determination about the presence of prejudice, the court assessed whether the instructions, taken as a whole, were sufficiently clear so as not to mislead and whether they fairly and correctly stated the law. *Korpalski*, 114 Ill. App. 3d at 568.

■ We find prejudice in this case because the jury could have reasonably found, based on the evidence presented, that someone else was the sole proximate cause of the baby's injuries. (*McCall v. Chicago Board of Education* (1992), 228 Ill. App. 3d 803, 810.) Testimony on plaintiffs' behalf never established that the baby was alive upon discovery of her existence. Instead, the testimony only established that the extent of the abruption in conjunction with a delayed delivery precluded complete revival upon delivery. Thus, the case is a close one, and it is not completely clear as to when the fatal injury or injuries were incurred and by whom they were inflicted. In our view, if the sole proximate cause instruction is not justified in the present case, then circumstances where it would be justified are difficult to imagine.

By refusing the sole proximate cause instruction, the trial judge, in effect, decided for the jury that the child was neither stillborn nor injured solely by the actions of Dr. Taylor. However, these are questions of fact which the jury should have been given a fair chance to determine. As it stands, the short form of the instruction tells the jury that it is not a defense that someone or something else may be to blame. This instruction is implicitly biased towards the plaintiffs' case. We determine that it is unfair where, as here, evidence was presented showing that another may have been the sole proximate cause of an injury but such evidence was not impartially presented by an appropriate instruction. Thus, the second paragraph of IPI Civil 3d No. 12.04 (and 12.05) must be given to the jury "in order to correct any negative implications arising from the first paragraph." (*Miyatovich v. Chicago Transit Authority* (1969), 112 Ill. App. 2d 437, 443.) According to *Miyatovich*, "[w]ithout the benefit of accurate wording to

this effect, the jury might cease its inquiry after finding a defendant's negligence to have been simply a cause of the injury, without considering whether it was a proximate cause thereof." *Miyatovich*, 112 Ill. App. 2d at 443.

The defendant here presented sufficient evidence to indicate that, even if it *was* negligent, its negligence had no effect on the condition of the baby. However, the court did not allow this theory to be presented properly via the long form instruction which would have equally presented defendant's theory simultaneously with the plaintiffs' theory of the case. Therefore, we find that the refusal of the long forms of IPI Civil 3d Nos. 12.04 and 12.05 was error which prejudiced defendant and requires a new trial. In this same vein, we determine it to be error where the trial court prevented testimony or questioning on matters speaking to the question of whether another person or occurrence was the sole proximate cause of decedent's injuries.

Defendant next argues that it was denied a fair trial because the trial court failed to advise the jury of a directed finding granted to defendant at the conclusion of plaintiffs' case. This directed finding related to two allegations in plaintiffs' complaint that Delnor Hospital's personnel injured (negligently or otherwise) Kathleen with an endotracheal tube during post-delivery resuscitation efforts. At the close of its case, defendant moved that the court advise the jury that all testimony regarding the placement or maintenance of the endotracheal tube be stricken and disregarded. Defendant also moved that the jury be instructed of the earlier directed finding. The trial court granted the motion with respect to barring arguments that plaintiffs' counsel would make in this regard. However, the trial court ruled it would not strike testimony already presented on the issue and would not instruct the jury on the directed finding.

■■ We need not address this issue because the case is being reversed on other grounds. We note, however, it is axiomatic that once an allegation has been nullified by a directed verdict, evidence proffered solely in support of that allegation would be irrelevant and immaterial.

Defendant next argues that the trial court improperly gave judicial recognition to a disputed fact. The instruction of concern here stated that defendant:

> "4. Failed to have anesthesia available to perform an emergency cesarean section within thirty minutes of Dr. Taylor's request for anesthesia *at approximately 8:40 to 8:45 p.m.*" (Emphasis added.)

Defendant argues that in giving this instruction the court lent judicial credence to a significant disputed fact, *i.e.*, the timing of the anesthesia request. Defendant asserts that the court should have instructed the jury that plaintiffs claimed defendant was negligent by failing to have anesthesia available within 30 minutes of Dr. Taylor's request without stating when the request occurred. This 30-minute period is one set by the hospital's Maternity Service Plan for the provision of anesthesia for an emergency cesarean section.

According to a chart of events maintained by a nurse present at Kathleen's delivery, Dr. Taylor instructed a nurse to assemble a medical team necessary to perform a cesarean section at 8:40 p.m. Thus, in order for the hospital to comply with its own Maternity Service Plan, emergency anesthesia would have had to be present by 9:10 p.m. However, anesthesia was not administered to Jacqueline Ellig until 9:23 p.m. Dr. Gerbie opined that the hospital's deviation from its standard of care caused or contributed to cause the injury and death of Kathleen Ellig. Defendant attempted to create a question of fact with respect to the timing of the anesthesia request by showing that the records the hospital kept were merely an approximation of the times events occurred and by showing that the events, as they were testified to by Dr. Taylor, necessarily implied that the call for anesthesia occurred at a time later than that indicated on the hospital records. Dr. Taylor testified that the decision to perform a cesarean section could have been made as late as 8:50 p.m.

■ Viewing the instructions as a whole, we determine that defendant's case was not prejudiced by the language cited above. First, the statement that Dr. Taylor's request occurred at approximately 8:40 to 8:45 p.m. arises in the context of an instruction explaining the plaintiffs' allegations. Therefore, it is unlikely that the jury construed the instruction as the judge's view of the facts. Moreover, the judge subsequently informed the jury that the instructions are not intended to indicate the judge's opinion as to the facts. Thus, while this instruction alone does not serve as a valid basis for reversal, it is phrased in such a way that a possibility for prejudice did exist. In one sense, the trial court gave credence to plaintiffs' allegations regarding the timing of the call for anesthesia by failing to similarly present defendant's position on the matter. The exact time the call for anesthesia was made is a question of fact. In order to avoid the possibility of jury confusion on remand, we suggest that the trial court avoid reference to one party's allegation regarding the timing of the anesthesia requests where no similar presentation is made on the other party's behalf.

Defendant next argues that the trial court incorrectly stated the applicable standard of care in the tendered jury instructions. Specifically, defendant asserts that the instructions had the effect of holding the *hospital* to the standard of care of a reasonably careful person (layperson). Defendant argues that a hospital should, instead, be held to the standard of care of same or similar institutions holding themselves out as providing health care services for individuals. We agree.

In our view, the instructions given to the jury on this issue were confusing and prejudiced defendant's case. Over defendant's objection, the trial court tendered the following instruction based upon IPI Civil 3d No. 105.03.01:

"In providing hospital services to Jacqueline Ellig and the infant, Kathleen Ellig, the defendant, Delnor Hospital, had a duty to exercise ordinary care. A failure to do so is professional negligence.

In deciding whether Delnor Hospital exercised ordinary care, you may consider expert testimony, professional standards, and hospital regulations presented in this case." See IPI Civil 3d No. 105.03.01 (1990).

According to the Notes on Use for IPI Civil 3d No. 105.03.01, the instruction incorporates the duty of a hospital or other treating institution to care for its patients as defined in *Darling v. Charleston Community Memorial Hospital* (1965), 33 Ill. 2d 326. In *Darling,* our supreme court upheld a decision in which a hospital was held negligent because the jury could reasonably have concluded that hospital nurses failed to attend properly to the plaintiff's broken leg. In identifying the hospital's duty, the court determined that it was permissible to rely upon regulations, standards, and bylaws related to the hospital's functions. The second paragraph of IPI Civil 3d No. 105.03.01 reflects these elements in defining a hospital's duty.

In the present case, during the jury instructions conference, plaintiffs asserted that the case involved the same kind of administrative activity complained of in *Darling.* Plaintiffs argued that the failure of the hospital to get the anesthesiologist on board in a timely fashion was an administrative function. In light of this theory, the jury was instructed, pursuant to IPI Civil 3d No. 105.03.01, that it could look to expert testimony, professional standards, and hospital regulations in order to determine whether Delnor was guilty of professional negligence.

In order to define the term "ordinary care" as it is used in IPI Civil 3d No. 105.03.01, and in accordance with the Notes on Use sec-

tion of IPI Civil 3d No. 105.03.01, IPI Civil 3d No. 10.02 was submitted to the jury. This instruction provides:

"When I use the words 'ordinary care,' I mean the care a reasonably careful person would use under circumstances similar to those shown by the evidence. The law does not say how a reasonably careful person would act under those circumstances. That is for you to decide." (IPI Civil 3d No. 10.02.)

Thus, the jury was essentially instructed that *professional negligence* results from a failure to exercise the care *a reasonably careful person* (layperson) would use under circumstances similar to those shown by the evidence.

█ We cannot see how this definition of ordinary care comports with the phrase as it is used in the context of defining the professional negligence of a hospital. The Notes on Use to IPI Civil 3d No. 105.03.01 suggest that IPI Civil 3d No. 10.02 be modified as appropriate when it accompanies IPI Civil 3d No. 105.03.01. Such a modification would seem to be one which defines "ordinary care" in terms of other "similarly situated institutions" rather than in terms of the "reasonable person," particularly where a case, such as this one, involves questions of professional negligence, rather than ordinary principles of negligence. (See IPI Civil 3d No. 105.03.01, Comment.) The standard of care to which a health care provider is held is not the same standard of care to which a layperson is held, unless the negligence is so grossly apparent or obvious that an ordinary layperson could appraise it. *Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 256.

The present case, which involves questions of the timing and administration of anesthesia, is not one which lies within the ken of an ordinary layperson. Therefore, it was inappropriate for the trial court to submit a reasonable person standard of care instruction. Instead, ordinary care should have been defined in terms of the care a reasonably careful, similarly situated institution would exercise under circumstances similar to those shown by the evidence.

A similar source of jury confusion could reasonably have resulted from the court's injection of a jury instruction based upon IPI Civil 3d No. 105.01 (1990). The instruction provided as follows:

"In providing professional services to JACQUELINE and KATHLEEN ELLIG, hospital personnel must possess and apply the knowledge and use the skill and care ordinarily used by reasonably well-qualified hospital personnel practicing under the circumstances similar to those shown by the evidence. A failure to do so is professional negligence.

The only way in which you may decide whether the hospital personnel of the defendant, Delnor Hospital, possessed and applied the knowledge and used the skill and care which the law required of it, is from expert testimony and/or evidence of professional standards presented in the trial. You must not attempt to determine this question from any personal knowledge you have." See IPI Civil 3d No. 105.01.

This instruction purports to instruct the jury on theories of negligence based on vicarious liability. In contrast, IPI Civil 3d No. 105.03.01 purports to instruct the jury on theories of institutional negligence. See IPI Civil 3d No. 105.03.01, Notes on Use.

■■ We determine that it is error to instruct the jury on two distinct theories of professional negligence absent some explanation as to how these theories apply to the case. The instructions, as they were tendered in the present case, inform the jury that Delnor Hospital was under two distinctly different duties: (1) to exercise "the care a *reasonably careful person* [reasonably careful layperson] would use under circumstances similar to those shown by the evidence" (emphasis added) (as per IPI Civil 3d No. 105.03.01 and IPI Civil 3d No. 10.02), and (2) that the hospital personnel "must possess and apply the knowledge and use the skill and care ordinarily used by *reasonably well qualified hospital personnel* practicing under the circumstances similar to those shown by the evidence" as established by expert testimony and/or evidence of professional standards presented in the trial (as per IPI Civil 3d No. 105.01). Thus, the jury is told that Delnor Hospital had a duty to exercise "ordinary care" at the same time it was told that the hospital had a duty to exercise "the care ordinarily used by other health care professionals."

In our view, the instructions, as they were given in the present case, could create a situation where the professional negligence of the defendant/hospital could be determined by looking to the actions of a layperson. This is an incorrect recitation of the law and, therefore, we hold that it was *error* to give IPI Civil 3d No. 105.01 when IPI Civil 3d No. 10.02 was also tendered concerning the same alleged breach of duty. *Leary v. Eng* (1991), 214 Ill. App. 3d 279, 284.

■■ As cited above, an error in tendered jury instructions is reversible where prejudice results. (*Korpalski*, 114 Ill. App. 3d at 568.) The error in the present case results from the incorrect recitation of the law which would allow the jury to judge the actions of a professional medical organization by using the standards applicable to a layperson. For example, the jury could have decided that a reasonable layperson would have had anesthesia available at a moment's notice

for an emergency cesarean section. However, professional duties and obligations, as identified by experts, regulations, and bylaws, may dictate otherwise. Prejudice also resulted from the failure to provide the jury with instructions that clearly identified the theories of plaintiffs' requested relief. The first asserts defendant's liability based upon its administrative failure to provide timely anesthesia. The second theory asserts that defendant was vicariously liable through the actions of its medical staff. When different theories of relief are requested, the jury should be more clearly informed about which standards apply to which theory of recovery so that they are not misled.

In sum, the juxtaposition of IPI Civil 3d Nos. 105.03.01 and 10.02 with IPI Civil 3d No. 105.01 creates a situation in which the potential for juror confusion is substantial. On the one hand, the jury is led to believe that it may apply its own knowledge and experience in assessing whether the hospital met the standards of ordinary care. On the other hand, the jury is led to believe that it may only consider expert testimony or evidence of professional standards in assessing whether the hospital met its standard of care. These instructions may have led to a situation where the jurors ignored the expert testimony with respect to the standard of care issue. Therefore, we determine that this issue was a source of prejudice to the defendant warranting reversal for a retrial.

Defendant next argues that the trial court tendered instructions to the jury which failed to distinguish between survival actions and wrongful death actions with respect to the calculation of damages. In light of our holding on the Survival Act count, we determine this issue to be moot and will not address it here. Likewise, because we reverse this case on other grounds, we will not address defendant's final assertion that counsel for plaintiffs made statements during trial and closing argument which allegedly prejudiced defendant. In addition, defendant's request for remittitur of the jury award is no longer relevant in light of our holding.

Finally, plaintiffs' cross-appeal of the trial court's order below granting a remittitur for medical expenses has been mooted with respect to the instant appeal. Therefore, we will not address it at this time.

The judgment of the circuit court of Kane County is reversed, and the cause is remanded for a new trial.

Reversed and remanded.

INGLIS, P.J., and DUNN, J., concur.