SARAH ANN FREEMAN, by and through her Father and Next Friend, Scott Freeman, *et al.*, Plaintiffs-Appellants, v. DENNIS J. PETROFF, Defendant-Appellee.

Fifth District    No. 5—94—0508

Opinion filed May 16, 1997.

Joseph L. Bauer, Jr., and Michael L. Nepple, both of Bauer & Baebler, of St. Louis, Missouri, for appellants.

Ray Freeark, of Freeark, Harvey, Mendillo, Dennis, Wuller & Buser, of Belleville, for appellee.

JUSTICE GOLDENHERSH delivered the opinion of the court:

Plaintiffs, Sarah Ann Freeman, a minor, by and through her father and next friend, Scott Freeman, and Scott Freeman and Lisa Freeman, Sarah Ann's parents, appeal from a judgment of the circuit court of Madison County entered on a jury verdict in favor of defendant, Dr. Dennis J. Petroff. This court in *Freeman v. Petroff*, 275 Ill. App. 3d 904, 656 N.E.2d 453 (1995), reversed the judgment and remanded the cause for a new trial. Defendant then filed a petition for leave to appeal and a motion for supervisory order with our supreme court, requesting that the supreme court enter a supervisory order requiring this court to sustain the verdict and judgment of the trial court in accordance with the court's opinion in *Leonardi v. Loyola University*, 168 Ill. 2d 83, 658 N.E.2d 450 (1995), filed shortly after this court's decision in *Freeman*. On January 31, 1996, the supreme

court denied defendant's petition for leave to appeal and, pursuant to its supervisory authority, remanded this cause to the appellate court for further consideration in light of *Leonardi*. *Freeman v. Petroff*, 165 Ill. 2d 550, 660 N.E.2d 544 (1996).

On remand, defendant, relying upon *Leonardi*, asserts that this court erred in its determination that to submit the long form of Illinois Pattern Jury Instructions, Civil, No. 12.04 (3d ed. 1989) (hereinafter IPI Civil 3d No. 12.04), a party alleging the negligence of a nonparty as the sole proximate cause of plaintiff's injury must establish a standard of care and demonstrate the nonparty's deviation from that standard. We affirm our initial holding in *Freeman* for the reasons stated below.

A detailed recitation of the facts is not necessary since they were previously set forth in the earlier opinion. Any additional facts will be discussed in this disposition.

Defendant posits that in *Leonardi* our supreme court held that a defendant may "endeavor to establish by competent evidence that the conduct of a third person, or some other causative factor, is the sole proximate cause of plaintiff's injuries" and that to give the second paragraph of IPI Civil 3d No. 12.04, all that is required is that there be some evidence in the record to support giving the instruction. *Leonardi*, 168 Ill. 2d at 101, 658 N.E.2d at 459. Defendant further contends that, under *Leonardi*, a defendant who wants to instruct on IPI Civil 3d No. 12.04 is not required to prove a *prima facie* case. Rather, a defendant must meet an evidentiary standard substantially less stringent than the plaintiff's burden of proof, namely, a defendant need only present "evidence tending to show" that the conduct of a nonparty or some other causative factor was the sole proximate cause of the injury in question and that this evidence may be slight.

In *Leonardi*, the decedent, who was seven months pregnant, was admitted to Loyola University Medical Center because her water broke prematurely and her pregnancy was considered high risk, requiring monitoring. Subsequent to admission, the decedent began to hemorrhage. She was examined by a senior resident, who contacted Dr. Thomas Tierney, decedent's attending physician. Dr. Tierney instructed the hospital staff not to perform a cesarean section until he arrived. Upon arrival, Dr. Tierney performed the cesarean section. When he attempted to remove the placenta, massive bleeding occurred and the decedent went into hypovolemic shock. Because the placenta was abnormally attached to the uterine wall, Dr. Tierney performed a hysterectomy. After surgery the decedent was given supplemental oxygen by mask.

The following day, Dr. Karlman, a resident, ordered the removal of the decedent's oxygen mask. Shortly thereafter, the decedent began to grow restless, had cyanotic lips, was perspiring heavily, and complained of abdominal pain. A blood-gas test revealed that the decedent was experiencing respiratory difficulties, and she was given oxygen by mask. The decedent's blood pressure dropped and she suffered respiratory arrest. An emergency pulmonary embolectomy was performed. The decedent's life was saved; however, she suffered irreversible brain damage. The decedent could not perform any activity of daily living, such as walking, eating, dressing, etc., nor was she able to speak. The decedent was discharged to a nursing home, where she died five years later. The decedent's estate brought a medical malpractice action against Loyola University Medical Center and certain resident physicians, the anesthesiologists, and Dr. Tierney, who died subsequent to the bringing of the suit.

The plaintiff in *Leonardi* argued that the trial court improperly tendered the second paragraph of IPI Civil 3d No. 12.04 because the defendant did not plead the sole proximate cause of Dr. Tierney as an affirmative defense and that there was no evidence in the record to support giving the second paragraph of the instruction. The *Leonardi* court held that a general denial of any proximate cause is sufficient for the defendant to raise the defense and that the defendant has the right "to endeavor to establish by competent evidence that the conduct of a third person, or some other causative factor, is the sole proximate cause of plaintiff's injuries." *Leonardi*, 168 Ill. 2d at 101, 658 N.E.2d at 459. The court in *Leonardi* further held that the second paragraph of IPI Civil 3d No. 12.04 can be given where there is some evidence in the record to support the theory of the instruction. The court stated that the evidence supporting the submission of the long form of IPI Civil 3d No. 12.04 may be slight and that a reviewing court may not reweigh it or determine if it should lead to a particular conclusion. *Leonardi*, 168 Ill. 2d at 100, 658 N.E.2d at 458. The *Leonardi* court concurred with the trial court that there was sufficient evidence in the record of Dr. Tierney's involvement to justify giving the second paragraph of IPI Civil 3d No. 12.04.

*Leonardi* is readily distinguishable from the case at bar. In *Leonardi*, the evidence showed that Dr. Tierney was the sole proximate cause of the injuries the decedent sustained. Expert testimony demonstrated that Dr. Tierney was the decedent's treating physician and was responsible for the medical treatment rendered to her. Most significantly, the named defendants, except for Dr. Balasaraswathi, were resident physicians at Loyola and were required to follow Dr. Tierney's orders regarding the decedent's medical care. Further, Dr.

Balasaraswathi, a defendant and one of the decedent's anesthesiologists, was called by the plaintiffs. Dr. Balasaraswathi testified that "the physician or nurse who was taking care of decedent should have, based on accepted medical practice, immediately administered to decedent oxygen and a blood gas test." *Leonardi*, 168 Ill. 2d at 95, 658 N.E.2d at 456. On cross-examination, it was made clear that Dr. Balasaraswathi "was referring in his direct examination to Dr. Tierney as someone who might have deviated from the standard of care." *Leonardi*, 168 Ill. 2d at 95, 658 N.E.2d at 456. Clearly, the evidence in *Leonardi* supported a sole-proximate-cause instruction.

Here, unlike *Leonardi*, there is no evidence that the nonparty, Children's Hospital, was the sole proximate cause of Sarah Ann's injuries. In their complaint, plaintiffs allege that defendant negligently failed to take steps to adequately and timely diagnose preeclampsia in Lisa. Because defendant failed to make a timely diagnosis and order the appropriate medical treatment of Lisa, Sarah Ann was prematurely born and sustained severe and permanent injuries.

After reviewing the contents of the record, we believe that there is sufficient evidence to support plaintiffs' allegations that defendant failed to make a timely diagnosis of Lisa's illness and order the appropriate medical treatment. While defendant's negligent conduct in rendering medical care to Lisa was not the sole proximate cause of Sarah Ann's injuries, his conduct was a proximate concurring cause, and but for the conduct, the injury would probably have not resulted. *Kincl v. Hycel, Inc.*, 56 Ill. App. 3d 772, 787-88, 372 N.E.2d 385, 389 (1977). As a consequence, it was error for the trial court to tender the long form of IPI Civil 3d No. 12.04.

At trial, Dr. Stanley Warner, an obstetrician, testifying on behalf of plaintiffs, stated that defendant should have evaluated Lisa in his office before March 22, 1988, because Lisa's calls to defendant reporting swelling, plus the development of the additional symptoms of nausea, heartburn, vomiting, and headaches, could have been indicative of preeclampsia. Dr. Warner further testified that an examination of Lisa to determine her blood pressure and weight gain, along with a urinalysis for protein, was necessary to discern the presence of pregnancy-induced hypertension or preeclampsia. Dr. Warner stated that defendant definitely should have examined Lisa on March 18, 1988, when she called complaining of headaches, nausea, and heartburn, as well as swelling, because she presented with more symptoms associated with hypertension of pregnancy and needed to be evaluated at that point. Dr. Warner opined that it was not appropriate for defendant to merely prescribe, via the telephone, white

soda and crackers, in lieu of examining Lisa. Dr. Warner also stated that when Scott Freeman contacted defendant the evening of Sunday, March 20, 1988, to report the worsening of Lisa's symptoms, Lisa should have been seen in an emergency room or hospital where her vital signs and blood pressure could have been taken and her urine checked. Defendant's prescription of an antacid and Tylenol was inappropriate treatment according to Dr. Warner.

Lisa finally came in for an office visit on March 21, 1988. Dr. Warner testified that Lisa's medical chart did not indicate that her blood pressure was checked or that she was weighed. Lisa's urine was not checked because she was unable to provide a urine sample. Dr. Warner opined that Lisa showed signs of preeclampsia and needed to be hospitalized to determine her status in terms of disease progression and not sent home with nausea medication and recommended bed rest.

Dr. Warner next testified regarding the differences between severe preeclampsia and mild preeclampsia. According to Dr. Warner, for mild preeclampsia, bed rest in the hospital is the treatment of course for a woman who, like Lisa, develops the disease early in pregnancy. Dr. Warner stated that in a hospital the woman gets complete bed rest while the nursing staff monitors the patient's condition. The goal of this treatment is to prolong the pregnancy to allow the fetus to mature, thereby improving the outcome of the child. In the case of severe preeclampsia, the mother and baby are at risk of having severe problems necessitating immediate delivery of the infant. Dr. Warner opined that had defendant examined Lisa earlier, he would have discovered the disease process sooner. Lisa probably could have been hospitalized and her pregnancy prolonged by perhaps two to four weeks, thereby affecting the outcome of the child. Finally, Dr. Warner stated that defendant's conduct in rendering medical care to Lisa fell below the national standard of care for practicing obstetricians.

Dr. Robert Karl Sigman, a perinatologist or maternal fetal medicine specialist, testified on behalf of defendant. On cross-examination, Dr. Sigman testified that Lisa had one of the major predisposing factors of preeclampsia: she was nulla parity, meaning she had not previously given birth. Regarding defendant's failure to record Lisa's blood pressure and weight on her March 21, 1988, visit to defendant's office, Dr. Sigman stated he could have imagined that defendant checked Lisa's blood pressure and weight because it is a common practice. However, Dr. Sigman conceded that his opinion regarding whether defendant checked Lisa's blood pressure and weight was "supposition."

Dr. Sigman next testified that by the office visit on March 22, 1988, when defendant checked Lisa's blood pressure, weight, and urine, she had severe preeclampsia. Dr. Sigman agreed that the March 22, 1988, office visit was defendant's first opportunity to diagnose Lisa's illness because it was the first time defendant checked her blood pressure, weight, and urine sample since early March when she first began to report symptoms. In response to plaintiffs' counsel's questions concerning the early detection of preeclampsia in its mild form, Dr. Sigman explained that preeclampsia may present in either the mild or severe form and that it could be mild and stay mild for the duration of the pregnancy or it could suddenly become severe. Dr. Sigman opined that Lisa had severe preeclampsia at the time of her eventual diagnosis on March 22, 1988, but that he did not know if that was the way the illness initially presented. A determination of whether Lisa presented with mild preeclampsia could not be made because no blood pressure, urinalysis, or weight was obtained from Lisa prior to the office visit on March 22, 1988.

Once it was determined that Lisa had severe preeclampsia, she was hospitalized, at Oliver Anderson Hospital in Maryville, but was later transferred to Jewish Hospital in St. Louis, Missouri. At Jewish Hospital, Dr. Michael Nelson confirmed the diagnosis of severe preeclampsia and determined that the baby would need to be delivered within hours. At trial, expert testimony concurred that when a pregnant woman develops severe preeclampsia, both mother and infant are at risk and that the baby must be delivered.

At birth Sarah Ann had a gestational age of 28 weeks and was approximately nine weeks premature. She weighed only 1 pound 11 ounces. Because of her prematurity, Sarah Ann was at risk for the development of problems related to prematurity. Expert witnesses for both plaintiffs and defendant testified that the medical problems Sarah Ann ultimately experienced are commonly experienced by premature infants.

At trial, plaintiffs' expert, Dr. Arthur Prensky, child neurologist, reviewed Sarah Ann's discharge diagnoses, which included hyaline membrane disease progressing to bronchial pulmonary dysplasia, pulmonic stenosis with atrial septal defect, status post patent ductus arteriosus (PDA) ligation, apnea and bradycardia, staph aureus pneumonia resolved, bilateral periventricular leukomalacia (PVL), and severe prematurity. Dr. Prensky testified that hyaline membrane disease, PDA, apnea and bradycardia, and PVL are primarily associated with prematurity, although they can appear in nonpremature infants. Regarding the staph aureus pneumonia, Dr. Prensky opined that while it is not limited to premature infants, these infants tend

to be more susceptible to it because premature babies are more likely to be on a respirator, and in very early prematures, their immature immune systems cannot fight off infection as well as older infants. Dr. Prensky stated that PVL, which results from inadequate blood flow to certain regions of the brain, is more apt to occur in premature infants and that the incidence of PVL increases the more premature the infant. Dr. Prensky further opined that Sarah Ann's development of PVL was caused by events related to her prematurity.

Dr. Michael Maurer, a neonatologist testifying for defendant, concurred with Dr. Prensky concerning the relationship between gestational age and the incidence of PVL in the following exchange with defense counsel:

"Q. Now, with respect to the PVL, periventricular leukomalacia, is there a relation between the gestational age of the infant and the neurologic problem such as PVL that are suffered by a child, even cerebral palsy?

A. Sure. There is a relationship in the sense that one sees an increasing, excuse me, an increasing incidence of PVL and increasing frequency of PVL and increasing frequency of cerebral palsy as you descend in gestational age.

Q. That means at a lower age—

A. One tends to see more of it. The farther out you get. The farther, closer you get to term, you see less of it. It doesn't appear as a problem to deal with. You simply see less of it.

Q. Is there a gestational age where the likelihood of neurological damage such as PVL or cerebral palsy reduces substantially?

A. I usually view it, sorry, more as a, as I said, a progressive reduction as one goes out in gestational age. Certainly at—babies at term, we do see PVL occasionally in that population, have a much reduced incidence, but as one descends in gestation the incidence gets higher and higher.

Q. Okay. And would there be a—would there be a gestational time when you see much less of it?

A. I would say once you leave prematurity, which is generally at around thirty-six, thirty-seven weeks in most people's view, that you tend to see much less PVL."

During cross-examination, Dr. Mauer acknowledged that infants born at 27 to 28 weeks of gestation frequently experience problems that can lead to PVL and that Sarah Ann experienced some of these problems:

"[Plaintiffs' counsel] Q. Okay. And the kinds of problems that she experienced are the kinds of problems that you would expect a premature infant at twenty-seven or twenty-eight weeks to likely encounter?

A. Those are problems that many of those patients encounter, except for the PVL. We don't, you know, thankfully see all that much of that, but—and except for the pulmonic stenosis and ASD, atrial septal defect, the hole in her heart—those are unique to her.

Q. The kind of events that can set up the setting for the development of periventricular leukomalacia, though, and even some of them that you found here, occur much more frequently with the premature of twenty-seven to twenty-eight weeks than say a term or even thirty-two or an older gestational age infant; isn't that true?

A. Well, we presume that they do in the sense that, as I said before, there's an increasing incidence of that problem along with others as you descend in gestational age, right."

As illustrated above, because of her premature birth, Sarah Ann was predisposed to developing an array of medical conditions which resulted in her injuries.

In sum, the confluence of events surrounding the delayed diagnosis of preeclampsia in Lisa and the premature birth of Sarah Ann was part of a natural and ongoing sequence which gave rise to Sarah Ann's injuries. Expert testimony established that to accurately diagnose preeclampsia, a physician must check the woman's blood pressure and weight gain, as well as perform a urinalysis for protein. Defendant did not examine Lisa and did not conduct the appropriate tests for identifying the disease until the March 22, 1988, office visit, several weeks after Lisa began reporting symptoms to defendant. Defendant's failure to properly examine Lisa earlier delayed the diagnosis of preeclampsia, limited the treatment options for prolonging the pregnancy, and led to the premature birth of Sarah Ann. Because Sarah Ann was born nine weeks premature, she was at risk for medical problems primarily associated with prematurity. Sarah Ann suffered a number of these medical problems, resulting in PVL and spastic cerebral palsy. Clearly, defendant's conduct was a proximate cause of Sarah Ann's injuries.

In light of the evidence presented, the record shows that the nonparty, Children's Hospital, was not the *sole* proximate cause of Sarah Ann's injuries. Thus, there was no basis in the record upon which to justify giving the second paragraph of IPI Civil 3d No. 12.04. Accordingly, the trial court erred in tendering the long form of the instruction to the jury.

The recent supreme court decision in *Holton v. Memorial Hospital*, 176 Ill. 2d 95 (1997), supports this position. Our supreme court reviewed the situation with the following:

"Defendant's specific challenge is to the omission from another

instruction, instruction No. 14, of a sole proximate cause provision based on conduct of *third parties*. As given to the jury, instruction No. 14 stated that 'more than one person may be to blame for causing an injury. If you decide that the defendant was negligent and that its negligence was a proximate cause of injury to the plaintiff, it is not a defense that some third person who is not a party to the suit may also have been to blame.' See IPI Civil 3d No. 12.04. According to defendant, the second paragraph of IPI Civil 3d No. 12.04 should have been included, as follows: 'However, if you decide that the sole proximate cause of injury to the plaintiff was the conduct of some person other than the defendant, then your verdict should be for the defendant.' Defendant argues that the inclusion of this provision would have properly allowed the jury to find that the conduct of Dr. Doubek, Dr. Murphy, or Dr. Sprich in failing to properly diagnose and treat Mrs. Holton, was the sole proximate cause of her injury.

We reject defendant's contention that the trial court abused its discretion in declining to include the above-quoted provision in instruction No. 14. A defendant is not automatically entitled to a sole proximate cause instruction wherever there is evidence that there may have been more than one, or concurrent, causes of an injury or where more than one person may have been negligent. Instead, a sole proximate cause instruction is not appropriate unless there is evidence that the *sole* proximate cause (not 'a' proximate cause) of a plaintiff's injury is conduct of another person or condition. See *Ballweg v. City of Springfield*, 114 Ill. 2d 107, 121[, 499 N.E.2d 1373] (1986); *cf. Leonardi v. Loyola University*, 168 Ill. 2d 83[, 658 N.E.2d 450] (1995). The usage notes following IPI Civil 3d No. 12.04 caution that the sole proximate cause provision 'should be used only where there is evidence tending to show that the sole proximate cause of the occurrence was the conduct of a third person.'

In the case at bar, defendant did not present evidence or argue that it was *only* the negligence of persons other than the hospital employees which proximately caused plaintiffs' injury. Instead, defendant attempted to establish that no medical negligence had occurred at all. Defendant did not charge that plaintiffs' treating physicians were negligent in their acts or omissions. On the contrary, much of the defense relied on the rationale that the treating physicians' diagnosis and treatment decisions were proper in light of the circumstances in which the decisions were made. For example, there was evidence that a cancerous tumor appeared to be the most likely diagnosis based on the information upon which the treating doctors based their decisions. The jury, however, found in favor of plaintiffs, under whose theory of the case

defendant's negligence proximately caused the treating physicians' misdiagnosis. Because neither plaintiffs nor defendant asserted at trial that the treating physicians themselves were negligent, we conclude that the trial court did not err in denying defendant's request for a sole proximate cause instruction based on the negligence of third parties." (Emphasis in original.) *Holton*, 176 Ill. 2d at 133-35.

Lastly, defendant insists that under *Leonardi* a defendant need only present some evidence tending to show that the conduct of a nonparty or some other causative factor was the sole proximate cause of the plaintiff's injury in order to instruct the jury using the long form of IPI Civil 3d No. 12.04. Defendant further asserts that this court erred in requiring that where the medical malpractice of a nonparty is alleged, the defendant must establish through expert testimony the generally accepted standard of care for the particular situation, a deviation from that standard, and a causal connection between the nonparty's deviation and the plaintiff's injury, in order to give the second paragraph of IPI Civil 3d No. 12.04. We disagree.

While *Leonardi* does not specifically address the issue of a standard of care by which to determine whether there is a sufficient evidentiary basis to give an instruction that includes the second paragraph of IPI Civil 3d No. 12.04, that case is instructive on this point. In *Leonardi*, Dr. Tierney's conduct was discussed within the context of an established standard of care. Dr. Balasaraswathi, on direct examination, testified regarding the accepted medical practice for a patient displaying the decedent's symptoms, which indicated, among other things, a pulmonary embolism.

*Holton* is also instructive on this issue. The last paragraph dealing with IPI Civil 3d No. 12.04 clearly indicates that negligence of a third party is the standard:

"In the case at bar, defendant did not present evidence or argue that it was *only* [(emphasis in original)] the *negligence* of persons other than the hospital employees which proximately caused plaintiffs' injury. Instead, defendant attempted to establish that no medical *negligence* had occurred at all. Defendant did not charge that plaintiffs' treating physicians were *negligent* in their acts or omissions. On the contrary, much of the defense relied on the rationale that the treating physicians' diagnosis and treatment decisions were proper in light of the circumstances in which the decisions were made. For example, there was evidence that a cancerous tumor appeared to be the most likely diagnosis based on the information upon which the treating doctors based their decisions. The jury, however, found in favor of plaintiffs, under whose theory of the case defendant's negligence proximately

caused the treating physicians' misdiagnosis. Because neither plaintiffs nor defendant asserted at trial that the treating physicians themselves were *negligent*, we conclude that the trial court did not err in denying defendant's request for a sole proximate cause instruction based on the *negligence* of third parties." (Emphasis added.) *Holton*, 176 Ill. 2d at 134-35.

How else does a party prove negligence in a case such as this except by establishing a standard of care, a deviation from that standard, and a causal connection between the nonparty's deviation and the plaintiff's injury?

In *Leonardi*, the defendant's cross-examination of Dr. Balasaraswathi revealed that Dr. Balasaraswathi was referring to Dr. Tierney in his direct examination as someone who might have deviated from the standard of care. Likewise, the defendant's hypothetical question posed to Dr. Balasaraswathi regarding Dr. Tierney's conduct was premised on the standard of care for the particular situation.

Contrary to defendant's assertion that a defendant need only present evidence tending to show the negligence of a nonparty without reference to a standard of care and a deviation therefrom by the nonparty in order to submit the long form of IPI Civil 3d No. 12.04, the authorities cited by defendant implicitly refer to a standard of care the nonparty deviated from in support of their decision that the long form of IPI Civil 3d No. 12.04 should be given. In *Ellig v. Delnor Community Hospital*, 237 Ill. App. 3d 396, 603 N.E.2d 1203 (1992), the court, in determining that Dr. Taylor was the sole proximate cause of the decedent's fatal injury, stated:

"Experts testified that Dr. Taylor could have obtained a precise reading on the baby's heart activity to determine exactly the baby's condition by using an available electrocardiogram through an *internal* monitor, instead of the *external* listening device which was in fact used. Having properly assessed the baby's condition, defendant's expert opined that Dr. Taylor should have performed a cesarean within eight minutes by using local anesthesia, assuming the placenta of the second twin had separated from the wall of the mother's uterus. Thus, there was evidence that Dr. Taylor was the sole proximate cause of the fatal injury by delaying and not immediately performing a cesarean by local anesthesia to save a severely compromised child." (Emphasis in original.) *Ellig*, 237 Ill. App. 3d at 407, 603 N.E.2d at 1211.

Clearly, the court is making reference to an established standard of care and the nonparty's deviation from that standard.

While the sufficiency of the evidentiary basis for submission of the long form of IPI Civil 3d No. 12.04 was not at issue in *Guzeldere v. Wallin*, 229 Ill. App. 3d 1, 593 N.E.2d 629 (1992), that case does ex-

amine the nonparty's negligence with respect to whether the defendant physician breached the applicable standard of care by not leaving orders for the nurse to contact him if the decedent infant's condition deteriorated. Expert witnesses for both plaintiff and defendant testified as to the signs of respiratory distress which indicated a deterioration of the decedent's condition, requiring notification of the physician. All experts testified that, when the decedent's respirations increased from 68 to 72 while asleep, the nurse should have contacted the defendant physician because the infant's condition had deteriorated. Although no standard of care was set forth for nurses, expert testimony did establish that the nurse deviated from the standard of care for caring for children with respiratory distress when she failed to call the physician when the infant's respirations increased. Therefore, the evidence supported the giving of IPI Civil 3d No. 12.04 in its entirety. Accordingly, we believe that this court did not err in its reasoning in its previous opinion in this case concerning the need to establish a standard of care and a deviation therefrom by a nonparty in order to determine whether there is an evidentiary basis to support giving the second paragraph of IPI Civil 3d No. 12.04. We conclude that, in the case at bar, there was an insufficient evidentiary basis to support giving a jury instruction that the sole proximate cause of the occurrence was a third party's conduct.

For the foregoing reasons, the judgment of the circuit court of Madison County is reversed, and the cause is remanded for a new trial.

Reversed and remanded.

KUEHN, P.J., and HOPKINS, J., concur.