JOHN E. KEMNITZ, Plaintiff-Appellant, v. EMANUEL SEMRAD, Defendant-Appellee.

First District (5th Division)   No. 1—88—1495

Opinion filed June 29, 1990.—Rehearing denied January 17, 1991.

Jeffrey E. Martin, of Karlin & Fleisher, and David A. Novoselsky & Associates, both of Chicago (David A. Novoselsky and Kathleen M. Krist, of counsel), for appellant.

Michael Resis and Victor J. Piekarski, both of Querrey & Harrow, Ltd., of Chicago, for appellee.

JUSTICE GORDON delivered the opinion of the court:

Plaintiff appeals from an order of the circuit court of Cook County refusing to instruct the jury on one of the issues raised by him in his medical malpractice action for a nerve injury resulting from surgery to repair a fractured humerus. Plaintiff contends that the trial court erred in refusing to instruct on his issue of whether defendant had improperly retracted the radial nerve during surgery to repair a fractured humerus. We affirm.

Plaintiff fractured his right humerus, the long arm bone extending from the shoulder to the elbow, while arm wrestling with his brother. Defendant diagnosed the fracture as a comminuted, or fragmented, fracture of the right distal humerus and, after conservative treatment failed, scheduled plaintiff for surgery to repair the fracture. Prior to the surgery, plaintiff was able to freely move his right fingers and wrist.

Defendant performed an open reduction and internal fixation of the humerus on May 2, 1980. During the surgery, he identified the radial nerve, retracted the nerve away from the humerus, and set the fracture, first using bone clamps to hold the fracture fragments in place and then a metal plate and screw to secure the positioning. During recovery, plaintiff first noticed that he was unable to extend his fingers. When plaintiff was later discharged from the hospital, he still had this problem with his fingers and defendant's discharge notes indicated that plaintiff had a temporary radial nerve palsy due to traction.

Plaintiff's radial nerve function did not return during the following months, and on December 16, defendant and Dr. John Bilos, a hand surgeon, performed surgery upon plaintiff to explore the radial nerve. They discovered the presence of a neuroma, a proliferative mass of cells and neurites developed at or to the proximal end of a severed nerve, near the fracture site. Dr. Bilos performed a resection in an attempt to repair the radial nerve. Despite the surgery, plaintiff did not regain full function of the radial nerve.

Plaintiff's medical expert, Dr. Richard Levy, a board-certified orthopedic surgeon, testified on direct examination that the medical standard of care in major medical centers was to protect the radial nerve during surgery to repair a fractured humerus. Based on Levy's review of the medical records and testimony and his experience and his education, he concluded that defendant had deviated from that

standard. He stated that his opinion was based on the presence and location of the traumatic neuroma. He postulated that because of the location of the neuroma, the radial nerve was damaged in one of four possible ways: (1) it could have been crushed between a bone clamp or other instrument and the bone; (2) it could have been retracted too forcefully, causing a traction injury to the nerve; (3) it could have gotten caught under the metal plate; or (4) it could have been caught within the break itself when the fracture was repositioned. Of the four possibilities, he stated that the nerve was most likely crushed between a bone clamp or other instrument and the bone. He further stated that "[t]he other means of causing a neuroma, such as inadvertently cutting the nerve, would have also cut the nerve *** [a]nd that wasn't present in this case."

Dr. Levy further testified on direct examination that the medical standard in major medical centers for retracting the radial nerve during surgery to repair the humerus was to identify the nerve and then to dissect sufficiently so that the nerve could be mobilized away from the bone without any undue force. When Levy was asked what he meant by undue force, he responded:

"If it requires very much force to pull on a nerve, you will permanently damage it.

One develops a feel from this during surgery as to whether the nerve feels loose enough so that you feel it can be moved and you're not putting any strain on the nerve itself."

He concluded that because of the presence of the neuroma, excessive retraction was one possible cause of the radial nerve damage. He did state on cross-examination, however, that aside from the neuroma, there was nothing in the records or other materials he reviewed to indicate that defendant had excessively retracted the nerve. Further, he testified that a nerve injury was a recognized risk of an open reduction and internal fixation.

Defendant's medical expert, Michael Pinzur, also a board-certified orthopedic surgeon, testified that defendant had conformed with the appropriate medical standard of care in protecting the radial nerve during the surgery to repair the humerus. He specifically stated that based on his review of the relevant records, he did not believe that the radial nerve was crushed by either the bone clamp, the bone fragments or the metal plate and did not believe that the radial nerve was subjected to excessive movement of the retractor.

At the close of proofs, defendant moved for a directed verdict on all issues, but the trial court only refused to instruct the jury on the excessive retraction issue, finding that plaintiff had failed to establish

a standard of care for retraction of the nerve. The court noted:

"It seems to me if you're going to testify—if you're going to say that there is a certain standard of care in terms of how much traction is used on the nerve, that there has to be some standard out there.

You have to establish that a doctor knows when it's pulled too much or that a pulling is too much. There has to be something there that's done that one would know in advance is beyond what is appropriate.

\* \* \*

There has to be some measure, and it really does have to be an objective measure that physicians have to meet.

And what you're saying is no there isn't, this is a subjective thing that doctors learn. And that's what your expert said. It's a subjective thing that doctors learn over a period of time as how to do this."

The case then went to the jury on the other three possible causes of the nerve injury, and the jury returned a verdict in favor of defendant.

Plaintiff contends that the trial court erred in refusing to instruct the jury on the retraction issue because his medical expert did in fact testify as to the appropriate medical standard of care. Defendant, without conceding the issue of whether plaintiff established a standard of care, primarily argues that the trial court's refusal to instruct was correct because plaintiff failed to establish any deviation from an appropriate medical standard of care. Defendant further argues that the only way plaintiff could have met his burden would have been if he had been permitted an inference of negligence based on a *res ipsa loquitur* theory but that he had earlier "withdrawn" that theory. We agree that plaintiff established a medical standard of care for retraction of the radial nerve during surgery but, nonetheless, affirm the trial court on the basis that plaintiff failed to show any deviation from that standard.

■■■ In a medical malpractice action, a plaintiff must establish a medical standard of care, a deviation from that standard, and a causal connection between that deviation and the injuries sustained. (*Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 432, 328 N.E.2d 301, 305.) The medical standard of care must be that of a reasonably well-qualified practitioner in the locality where the defendant doctor practices (*Purtill v. Hess* (1986), 111 Ill. 2d 229, 242, 489 N.E.2d 867, 872) and not merely the subjective standard of one who testifies. (*Stevens v. Sadiq* (1988), 176 Ill. App. 3d 333, 338-39, 530 N.E.2d

1159, 1162.) The standard serves as a guide by which to measure a defendant's conduct in a particular situation. (*Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 255, 381 N.E.2d 279, 282.) Because medicine is not an exact science, an acceptable medical standard of care need not be precise but may provide for the exercise of individual judgment as long as it is within the framework of established procedures. (See *Piano v. Davison* (1987), 157 Ill. App. 3d 649, 667, 510 N.E.2d 1066, 1079.) Where there is an insufficient evidentiary basis to give an instruction on an issue in a medical malpractice case, it would be reversible error to give such an instruction. *Gruidl v. Schell* (1988), 166 Ill. App. 3d 276, 282, 519 N.E.2d 963, 967.

▇ In the present case, plaintiff did establish a medical standard of care for retraction of the nerve during surgery to repair a fractured humerus. Dr. Levy, plaintiff's expert, testified that the standard in major medical centers was to first identify the radial nerve and then sufficiently dissect it so that it could be moved away from the bone without too much force. Although Dr. Levy could not quantify the amount of force that would be too much, he did state that "[o]ne develops a feel from this during surgery as to whether the nerve feels loose enough so that you feel it can be moved and you're not putting any strain on the nerve itself." This testimony was sufficient to establish a guide for judging defendant's conduct. It demonstrated that there was a generally accepted procedure for first identifying the nerve and then dissecting it sufficiently so that it is loose enough to not put any strain on the nerve. This standard was sufficiently understandable for a jury to measure defendant's conduct during the surgery and determine whether he deviated from it. See *Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 262, 381 N.E.2d 279, 285.

The fact that Dr. Levy could not testify as to the specific amount of force that would be "too much" in retracting the nerve did not make this standard a subjective standard. Levy did not testify as to his own personal preference for retracting the nerve. He expressly testified to the standard of medical care in major medical centers nationwide. Thus, this was not a situation like that in *Stevens v. Sadiq* (1988), 176 Ill. App. 3d 333, 530 N.E.2d 1159, where a doctor testified as to his own personal standard of care. (See also *Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 381 N.E.2d 279.) Moreover, to require that there always be a mathematical, quantifiable standard of medical care in surgical procedures would create a near impossible burden for a plaintiff to meet. Medical treatment often requires the exercise of qualitative judgment. That judgment frequently varies from patient to patient, dependent upon such factors as the physical structure and

condition of the person being treated. To require a plaintiff to establish a quantitatively identical standard for the treatment of every patient would be inconsistent with this reality of medical treatment. See *Piano v. Davison* (1987), 157 Ill. App. 3d 649, 510 N.E.2d 1066.

A similar type of standard was testified to in *Piano v. Davison* (1987), 157 Ill. App. 3d 649, 510 N.E.2d 1066. There, one of defendant's medical experts testified that the standard of care for placement of a burr hole in the skull was

> " 'after you accumulate experience, everyone puts their hole somewhere in that area, but not exactly.' As a neurosurgeon does more and more shunts, 'he will determine what his own landmarks are. *** It all depends on what works in your own hands.' " (*Piano*, 157 Ill. App. 3d at 660, 510 N.E.2d at 1074-75.)

Plaintiff argued that this testimony failed to establish a medical standard of care because it only represented the doctor's personal standard. The *Piano* court, however, rejected the argument, stating: "Illinois courts recognize that medicine is not an exact science, but instead is a profession which involves the exercise of individual judgment within the framework of established procedures ***." (*Piano*, 157 Ill. App. 3d at 667, 510 N.E.2d at 1079.) In the present case, the judgment exercised to determine the amount of force appropriate for that retraction was one such exercise of individual judgment within the framework of the established procedure of first identifying and then sufficiently dissecting the nerve so that it is loose enough not to put any strain upon it. As such, it constituted an appropriate standard of care.

■■ ■ We find, however, that plaintiff failed to establish that defendant deviated from this standard of care. Since plaintiff's amended complaint contained only allegations of ordinary negligence, his burden was to prove by affirmative evidence that, judged by this standard, the defendant doctor was unskillful or negligent. (*Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 423, 328 N.E.2d 301, 305.) He failed to do so in this case.

The sole evidence which relates to this element of plaintiff's malpractice claim again comes from the testimony of Dr. Levy, his medical expert. On direct examination, Levy testified that it was his opinion that defendant deviated from the appropriate standard of care in his treatment of the nerve, but that his opinion was based on the presence of the neuroma at the site of the severed nerve. He stated that he believed that the nerve was damaged in one of four ways, including the possibility that it was retracted too forcefully, *solely* be-

cause of the presence of a traumatic neuroma. On cross-examination, he testified that aside from the neuroma, there was nothing in the records he reviewed to indicate excessive retraction. He added that:

"[B]ecause there is a neuroma *** something had to happen. And the four possibilities I gave were my opinion as to the most likely cause[s] of how this neuroma became present.

***

There is no other means of developing a traumatic neuroma other than injuring a nerve."

Dr. Levy's testimony does not constitute affirmative evidence that defendant was unskillful or negligent in performing the retraction. Although he did conclude that defendant had deviated from the standard of care, his testimony does not support such a conclusion. The only support for this conclusion was the presence of the neuroma, a symptom of the injury, from which Levy reasoned backwards that there must have been a deviation. There was no other evidence in the various materials he reviewed that defendant had deviated from the standard of care. Under ordinary negligence theory, one cannot establish negligence through the mere existence of an injury. (See *Spike v. Sellett* (1981), 102 Ill. App. 3d 270, 273, 430 N.E.2d 597, 600; *Scardina v. Colletti* (1965), 63 Ill. App. 2d 481, 488, 211 N.E.2d 762, 765.) There must be affirmative evidence of negligence.

In *Scardina v. Colletti* (1965), 63 Ill. App. 2d 481, 211 N.E.2d 762, plaintiff charged malpractice based on a failure to ligate a blood vessel and based his claim of a deviation largely on a bad result. In granting defendant's motion for a directed verdict, the court noted that the proper burden for establishing a deviation was:

"The plaintiff must prove by affirmative evidence that the defendant was unskillful or negligent ***. It is not enough to prove that he made a mistake or that his treatment harmed the plaintiff; proof of a bad result or mishap is no evidence of lack of skill or negligence." (*Scardina*, 63 Ill. App. 2d at 488, 211 N.E.2d at 765.)

Similarly, in the present case, plaintiff's claim of a deviation is based on Levy's testimony concerning the neuroma and its likely cause and, as such, was insufficient to establish a deviation.

Nonetheless, plaintiff argues that Dr. Levy's direct examination testimony established that defendant deviated from the standard of care and was sufficient to permit the issue to go to the jury. He further argues that any contradictions or inconsistencies present in his cross-examination ought not be considered for purposes of determining whether he has met his burden but as matters going to the weight

and credibility of his testimony. His argument, however, is based on the false premise that Levy's direct examination testimony did establish affirmative evidence of a deviation. Although Levy did state in a conclusory fashion that there was a deviation, he clearly indicated on direct examination that he based his opinion solely on the presence of the neuroma, which as previously indicated is insufficient to establish a deviation. *Scardina v. Colletti* (1965), 63 Ill. App. 2d 481, 488, 211 N.E.2d 762, 765.

Where there is no evidence to support an issue, a trial court's refusal to instruct on that issue is proper. (*Probus v. Brown* (1975), 33 Ill. App. 3d 639, 641, 338 N.E.2d 231, 232.) Since plaintiff failed to prove defendant's deviation from the relevant medical standard, the trial court's refusal to instruct on that issue was proper.

We need not consider whether plaintiff could have developed his case under a *res ipsa loquitur* theory since he dropped the *res ipsa loquitur* count contained in his initial complaint when he amended it.

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

COCCIA, P.J., and MURRAY, J., concur.