DEBRA RUESCH *et al.*, Indiv. and as Parents and Next Friends of Michael Ruesch, a Minor, Plaintiffs-Appellants, v. RICHLAND MEMORIAL HOSPITAL, Defendant-Appellee.

Fifth District    No. 5—91—0890

Opinion filed April 13, 1994.

Phebus, Tummelson, Bryan & Knox, of Urbana (Nancy J. Glidden and Joseph W. Phebus, of counsel), for appellants.

Croegaert, Clark & Hough, Ltd., of Olney (John A. Clark and Stephen J. Hough, of counsel), for appellee.

JUSTICE GOLDENHERSH delivered the opinion of the court:

Plaintiffs, Debra Ruesch and Walter Ruesch, individually and as parents and next friends of Michael Ruesch, a minor, appeal from a judgment of the circuit court of Richland County entered on a jury

verdict in favor of defendant, Richland Memorial Hospital (the hospital). Plaintiffs raise seven issues on appeal: (1) whether the verdict was contrary to the manifest weight of the evidence, (2) whether plaintiff Michael Ruesch was entitled to a judgment notwithstanding the verdict, (3) whether improper defense conduct generally was so prejudicial that it denied plaintiffs a fair trial, (4) whether defense counsel's conduct during closing argument was so prejudicial that it denied plaintiffs a fair trial, (5) whether the trial court erred in refusing to strike defendant's purported affirmative defense that the conduct of Dr. William Mayfield, Debra's obstetrician, was the sole proximate cause of Michael's injuries, (6) whether the trial court erred in instructing the jury, and (7) whether the errors, when considered cumulatively, denied plaintiffs a fair trial. We reverse and remand for a new trial. Our resolution of this appeal focuses exclusively on the sole proximate cause issue raised by plaintiffs, making a detailed recitation of all facts unnecessary. The pertinent facts include the following.

Debra gave birth to her first child, Jason, on November 22, 1976, by cesarean section. She was later divorced from Jason's father. Several years after her divorce, she married Walter and became pregnant with her second child, Walter's first. Debra's first obstetrical visit with Dr. Mayfield occurred when she was approximately 15 to 16 weeks into her pregnancy. On her initial visit with Dr. Mayfield, a vaginal birth after cesarean (VBAC) delivery was discussed. VBAC's were not routinely attempted until the mid-1980's. Prior to that time, doctors believed that once a woman delivered by cesarean, she should deliver subsequent babies also by cesarean. Debra discussed with Dr. Mayfield her desire to attempt a VBAC delivery. Dr. Mayfield believed Debra was an appropriate candidate to attempt a VBAC delivery. After Debra's initial visit with Dr. Mayfield, her pregnancy continued without complications.

On February 2, 1987, Debra went to Dr. Mayfield's office after rupture of her membranes at approximately 1:15 p.m. Dr. Mayfield examined her and sent her to the hospital where she arrived at approximately 3 p.m. Dr. Mayfield checked on Debra at the hospital at 6 p.m. At that time she was having some contractions, but they were irregular and of poor quality. Dr. Mayfield next checked on Debra at 9:40 p.m., at which time she was two centimeters dilated, the cervix was not effaced, and Michael was at a relatively high station. In order for a woman to deliver, she must be 8 to 10 centimeters dilated, 100% effaced, and the baby must be at a plus three station. Prior to the onset of labor, a baby is at a minus three station. The baby must then drop into the birth canal, which is considered zero.

At the time of delivery, a baby is at a plus three station. By 5:10 a.m. on February 3, Debra was still not contracting regularly, and Pitocin, a drug used to increase uterine contractions, was administered intravenously. By 11 a.m., Debra was three centimeters dilated, 60% effaced, and remained at a minus three station. At that time, Debra was tired and asked for a cesarean section. Dr. Mayfield encouraged Debra to continue with labor, as she was beginning to contract regularly and external monitoring showed Michael was doing well. Dr. Mayfield and Debra agreed that if she did not progress within the next hour a cesarean would probably be performed.

Mary Ann Ashworth, an obstetrics nurse at the hospital, was assigned to care for Debra on February 3. Ashworth started her shift at approximately 6:45 a.m. Dr. Mayfield testified that he told Ashworth after his 11 a.m. visit with Debra to alert the operating room staff that there was a good chance a cesarean would have to be performed. Ashworth was not specifically asked about such a conversation at trial. As of February 3, 1987, there existed no written policy concerning VBAC's and coordination between the operating room, the labor and delivery suite, and the obstetrician in case of cesarean sections. There was also no written policy addressing the handling of VBAC deliveries. The operating room of the hospital was staffed from approximately 7 a.m. to 3 p.m. If an operation was necessary after 3 p.m, the operating room staff would have to be called back, unless the operating room had been previously instructed to stay. Dr. Mayfield testified that based upon his order to Ashworth, he believed the operating room staff would be ready at noon to do a cesarean section if necessary. He also believed the operating room and staff would be ready the remainder of the afternoon, including after 3 p.m., in case a cesarean section was necessary, because of his order to Ashworth to alert the operating room staff that there was good chance he would be performing a cesarean section. Dr. Mayfield wanted to assess the situation on an hour-to-hour basis and see how Debra was progressing.

Several other hospital employees testified about their understanding of Debra's status and whether a cesarean section would be performed. None of the operating room staff received a direct order to remain in the hospital past 3 p.m. in order to be ready to perform a cesarean section on Debra. However, all were aware that Debra was a VBAC patient, had been in labor for some time, and might be in need of a cesarean section. Only one member of the operating room staff, Joe Frye, testified that he checked on Debra's status before leaving the hospital on February 3. Frye called obstetrics and talked with an unidentified staff person. After the conversation, Frye was

under the impression that a cesarean section would not be performed on Debra, and he left the hospital at approximately 5 p.m.

Dr. Mayfield examined Debra intermittently throughout the afternoon. At approximately 2:45 p.m., Debra developed a fever of 101 degrees Fahrenheit, and Dr. Mayfield was called to examine her. Dr. Mayfield conferred with a pediatrician and ordered Tylenol suppositories. At approximately 4:20 p.m., Debra was still at a zero station but was 100% effaced and completely dilated. Dr. Mayfield still felt that Debra had a chance to deliver vaginally, so it was decided that Debra would push for one hour. If she did not deliver within the allotted time, a cesarean section would be performed. Dr. Mayfield believed an operating room was ready if a cesarean section became necessary because of his previous discussion with Ashworth. Debra pushed for an hour without much success. At 5:20 p.m., Dr. Mayfield ordered an immediate cesarean section. He left Debra's room to fill out the necessary paperwork.

A 5:25 p.m. entry on Debra's chart, made by the nurses, noted that Debra was prepped for surgery and her consent form was signed. Shortly thereafter, the nurses attending to Debra noticed a change in the fetal heart tones, as shown through an external monitor. Three nurses discussed the changes, and they ultimately determined that Dr. Mayfield should be summoned. Dr. Mayfield testified that he was summoned and returned to Debra's room at 5:40 p.m. Dr. Mayfield reviewed the tracings and discovered that the baseline fetal heart rate was much slower at 5:40 than it had been at 5:20. According to Dr. Mayfield, variability of accelerations were absent. The first time Dr. Mayfield was aware that an operating room was not ready to perform the cesarean section was at 5:40 p.m. At that time, Michael's condition had so deteriorated that Dr. Mayfield did not believe he could await the arrival of the operating room staff, which had been called back, and he believed a forceps delivery might be possible. After two separate forceps attempts, Michael was delivered vaginally.

Upon delivery, Michael was suffering from neonatal asphyxia. Michael also sustained a subarachnoid hemorrhage during the forceps delivery. A few hours after he was delivered, Michael was transferred to a hospital in Evansville, Indiana. Upon his discharge from the Evansville hospital, he was diagnosed with neonatal asphyxia, subarachnoid hemorrhage, and a convulsive disorder as a result of massive brain damage associated with birth. Because of his injuries, Michael is severely retarded and will permanently remain at the developmental stage of a one-month-old infant. He is legally blind but does respond to sound.

Dr. Mayfield settled with plaintiffs prior to trial. A limiting order

was entered by the trial court which prohibited discussion of the fact that Dr. Mayfield was made a party to the suit but settled with plaintiffs prior to the start of trial. The jurors were unaware that the hospital would receive the benefit of his settlement by a credit against any adverse judgment against the hospital.

Two experts testified for plaintiffs at trial. Dr. Gerald I. Zatuchni, a professor of obstetrics and gynecology at Northwestern University Medical School, admitted that Dr. Mayfield deviated from the standard of care in not performing a cesarean section on Debra by 3 p.m. However, Dr. Zatuchni was adamant that had Michael been delivered by cesarean section any time prior to 5:30 p.m., he would have been normal. Dr. Zatuchni pointed out that no meconium was found in the amniotic fluid, which would indicate that Michael did not suffer from a long period of undue stress while in the uterus. Dr. Zatuchni opined that Michael was not in serious distress until the last 10 to 15 minutes before delivery, and if a cesarean section had been performed any time prior to 5:30, Michael most likely would have been normal. According to Dr. Zatuchni, a cesarean section performed at 5:30 would have saved Michael from 16 minutes of oxygen deprivation and saved him from the trauma caused by the forceps delivery. Both plaintiffs' and defendant's experts agreed that one-third of Michael's injuries were caused by the forceps delivery. Dr. Zatuchni did not believe that the infection causing Debra's temperature to rise played any role in Michael's injuries. Blood tests after birth revealed that Michael was infection-free at birth.

In Dr. Zatuchni's opinion, the hospital fell below the standard of care in providing obstetrical care in the instant case in that (1) it failed to have a clearly defined written policy as to the handling of VBAC patients, (2) it failed to provide a policy of communication between the obstetrical staff and the operating room staff, and (3) its staff in the operating room was negligent in not checking with the obstetrical staff prior to leaving the hospital even though they were aware that there was a VBAC patient in labor who might need a cesarean section. Testimony presented at trial was that it is common knowledge in the medical profession that approximately one-third of those attempting a VBAC delivery will be unsuccessful.

The American College of Obstetrics and Gynecology has set forth guidelines concerning performance of cesarean deliveries. The guidelines set forth that hospitals must have the ability to perform a cesarean delivery within 30 minutes from the time the decision is made until the surgical procedure is started. Dr. Zatuchni testified that the 30-minute limitation placed on hospitals is for the entire country and includes situations where a woman walks in off the

street and a cesarean section is immediately ordered. In a situation such as the one presented here, Dr. Zatuchni opined that the 30-minute rule should be inapplicable because the operating room was alerted in advance of Debra's VBAC status. Dr. Zatuchni believed a cesarean section should have been performed within 15 minutes of Dr. Mayfield's order.

Dr. Suzanne Trupin also testified on behalf of plaintiffs. She is the head of the department of obstetrics and gynecology at the University of Illinois College of Medicine and practices in Champaign County. Dr. Trupin reviewed Debra's records concerning the delivery of her first son and stated that nothing in the record contraindicated a VBAC attempt of Michael. Dr. Trupin also agreed that as of approximately 3 p.m., Dr. Mayfield was negligent in not performing a cesarean section; however, Dr. Trupin believed that Michael would have been significantly healthier if delivered between 5:20 and 5:30 p.m. by cesarean section as opposed to the later forceps delivery. Dr. Trupin believed it was appropriate for Dr. Mayfield to order an immediate cesarean section at 5:20. The nurses' record reveals that the prep was completed by 5:25 p.m., which was appropriate. Dr. Trupin believed, however, that the nurses should have immediately notified Dr. Mayfield of an agonal pattern in the tracings noticeable at approximately 5:30 p.m. Such tracings indicated Michael was in serious distress.

Dr. Trupin opined that the hospital's failure to have a written VBAC policy fell below the accepted minimum standards of care and significantly contributed to Michael's damages. Moreover, Dr. Mayfield's verbal order to alert the operating room staff that there was a VBAC patient with a potential for a cesarean was sufficient to require the operating room staff to remain at the hospital until the patient delivered. Dr. Trupin opined that the hospital staff violated the standard of care in leaving the hospital without Dr. Mayfield's permission.

The hospital's expert, Dr. Richard Aubry, teaches high-risk obstetrics at the State University of New York and practices there. Dr. Aubry opined that by 3 p.m., Michael was in serious trouble, and Dr. Mayfield was negligent in not ordering a cesarean section by that time. Dr. Aubry based his opinion on a review of Debra's medical records, which indicated that Debra had not made adequate progress in her labor by 3 p.m., fetal distress was occurring, and the fetus was experiencing the effects of maternal chorioamnioitis. Dr. Aubry testified that between 4 and 4:30 p.m. the tracing showed almost an agonal rhythm, which "one sees before the baby dies intrauterine from lack of oxygen, and it is characterized by the late decelerations plus the reduction in beat-to-beat variability." On cross-examination,

Dr. Aubry admitted that the tracings may not have shown an agonal pattern between 4 and 4:30 p.m., but that by 5 p.m. the baby was in severe distress. According to Dr. Aubry, the majority of Michael's injuries are attributable to a combination of the four to five hours of fetal distress occurring prior to 5:20 p.m. and the subsequent forceps delivery. Like the other experts, Dr. Aubry believed that one-third of Michael's injuries were the result of a forceps delivery. On cross-examination, Dr. Aubry admitted that a portion of Michael's damages occurred after 5:30 p.m. Dr. Aubry testified that in his opinion Dr. Mayfield's decision to do a forceps delivery was a breach of the standard of care.

Dr. Aubry believed that Dr. Mayfield's other options besides doing a forceps delivery were to let nature take its course or to wait until the operating room staff arrived and perform a cesarean section. Plaintiffs' experts, however, believed that Dr. Mayfield's decision to attempt a forceps delivery was within the accepted medical standard due to the circumstances presented by the absence of the operating room staff.

Dr. Aubry was familiar with the American College of Obstetrics and Gynecology guidelines which provided that if an emergency delivery is necessary, the hospital and staff must be able to respond within 30 minutes from the time the decision is made. In Dr. Aubry's opinion, the hospital met this standard. On cross-examination, Dr. Aubry admitted that the 30-minute requirement was for all cesarean sections. VBAC's are not separately discussed.

Prior to the start of trial, plaintiffs filed a motion to strike the hospital's affirmative defense of sole proximate cause. The affirmative defense filed by the hospital alleged that the actions of Dr. Mayfield were the sole proximate cause of Michael's injuries in that Dr. Mayfield failed to timely order a cesarean section and failed to advise the hospital staff to remain on the premises at the end of their shift. Plaintiffs challenged the affirmative defense with a motion to strike, asserting that defendant did not raise an affirmative defense at all since the pleading did not raise matters beyond those which were already contained in the complaint and answer. Plaintiffs argued that it was their burden to prove that negligence on the part of the hospital was a proximate cause of plaintiffs' injuries, and since the success of their cause of action turned on this point, any purported affirmative defense as to sole proximate cause was of no effect. The trial court refused to strike the hospital's affirmative defense of sole proximate cause. Plaintiffs argue herein that the trial court's denial of their motion to strike created a ripple effect which impermissibly disadvantaged plaintiffs. According to plaintiffs, the hospital was

secure in the knowledge that its affirmative defense was ruled viable and, thus, concentrated nearly all its energies upon Dr. Mayfield's negligence. Plaintiffs also contend that the jury was improperly instructed as to sole proximate cause. The hospital responds that the trial court was correct in refusing to strike its affirmative defense of sole proximate cause because defendant consistently maintained that it committed no negligence whatsoever. Defendant also contends that in the instant case the jury was fairly and accurately instructed on the issue of sole proximate cause. We agree with plaintiffs that the trial court erred in refusing to strike defendant's affirmative defense of sole proximate cause and erred in giving an issues instruction based thereon, specifically defendant's number 2.

It is fundamental that there may be more than one proximate cause of an injury and that one is liable for its negligent conduct whether it contributed in whole or in part to the plaintiff's injury as long as it was one of the proximate causes of the injury. (*Nelson v. Union Wire Rope Corp.* (1964), 31 Ill. 2d 69, 88, 199 N.E.2d 769, 780.) "In such a situation, one guilty of negligence cannot avoid responsibility merely because another person is guilty of negligence contributing to the same injury \*\*\*." (*Sears v. Kois Brothers Equipment, Inc.* (1982), 110 Ill. App. 3d 884, 889, 443 N.E.2d 214, 219.) There is support for the refusal to instruct a jury on sole proximate cause when the simple issue is whether the defendant is liable. For example, in *Baker v. CSX Transportation, Inc.* (1991), 221 Ill. App. 3d 121, 581 N.E.2d 770, an employee brought an action against the railroad for injuries he sustained as a result of the railroad's violation of various Federal statutes. The *Baker* court affirmed the trial court's order allowing the employee's motion to strike the railroad's affirmative defense of sole proximate cause and the employee's motion to enter an *in limine* order barring further evidence on that issue. The employee's action was brought in part for the railroad's violations of the Safety Appliance Act (45 U.S.C. § 1 *et seq.* (1976)) and the Locomotive (Boiler) Inspection Act (45 U.S.C. § 23 *et seq.* (1976)). Under both Acts, if an employee establishes a violation of the Act, the employee's alleged negligent conduct is irrelevant because actions under both the Safety Appliance Act and the Boiler Inspection Act are strict liability and the employee's alleged contributory negligence or comparative fault is not to be considered. The railroad's theory was that the employee was the sole proximate cause of his injury. The railroad argued on appeal that the striking of its sole proximate cause defense and the barring of any further evidence on that point during the employee's case was analogous to an unfounded and untimely directed verdict and was also an invalid use

of an order *in limine*. (*Baker*, 221 Ill. App. 3d at 130, 581 N.E.2d at 777.) The *Baker* court specifically stated:

"It is patent, however, that if plaintiff's negligence was the *sole* cause, then the violation of the Acts could not have contributed in whole or in part to the injury. (*Beimert v. Burlington Northern Inc.* (8th Cir. 1984), 726 F.2d 412, 414.) It is equally clear that proof of violation of the safety appliance statutes without more proves negligence and also eliminates contributory negligence as a consideration for any purpose, with causation the only issue then remaining. (*Rogers v. Missouri Pacific R.R. Co.* (1957), 352 U.S. 500, 507 n.13, 1 L. Ed. 2d 493, 499-500 n.13, 77 S. Ct. 443, 449 n.13.) It is for this reason that an instruction on the sole-proximate-cause defense is not favored because of its tendency to 'distract the jury's attention from the simple issues of whether the carrier was negligent and whether that negligence was the cause, in whole or in part, of the plaintiff's injury.' *Page [v. St. Louis Southwestern Ry. Co.* (5th Cir. 1965)], 349 F.2d [820,] 827." (Emphasis in original.) *Baker*, 221 Ill. App. 3d at 130-31, 581 N.E.2d at 777.

In the instant case, there is no question but that the hospital's affirmative defense of sole proximate cause distracted the jury's attention from the issue of whether the hospital was at all negligent. The focus instead became Dr. Mayfield's negligence and absence from the trial. A review of the transcripts shows the hospital capitalized on Dr. Mayfield's settlement and resulting absence from the trial. A pretrial ruling disallowed the introduction of evidence that Dr. Mayfield had settled and that the hospital would receive the benefit of his settlement as a credit against any adverse judgment against the hospital. The hospital took full advantage of this ruling throughout the trial. For example, during closing argument, defense counsel rhetorically asked "Well, why wasn't Bill Mayfield getting skewered? Why isn't Bill Mayfield here today?" Such comments were clearly designed to make the jury believe no cause of action was ever brought against Dr. Mayfield and that he never took responsibility for his negligent actions, which is contrary to the facts.

The general rule is that a court must instruct a jury on all issues reasonably presented by the evidence. Each party is entitled to have a jury adequately instructed as to his theory of the case, and failure to do so may require a new trial. *Ellig v. Delnor Community Hospital* (1992), 237 Ill. App. 3d 396, 405, 603 N.E.2d 1203, 1209.

Here, the hospital's theory at trial was that it committed no negligence whatsoever and only Dr. Mayfield's negligence caused plaintiffs' injuries. The hospital's expert, Dr. Aubry, testified that nearly all of plaintiffs' injuries were caused by Dr. Mayfield's

negligence, as Michael was in acute distress all afternoon. Dr. Aubry stated that Dr. Mayfield's failure to order a cesarean section by 3 p.m. was "substandard by a major quantum." Plaintiffs' experts agreed that Dr. Mayfield should have ordered a cesarean section by 3 p.m., but plaintiffs' experts also believed that the hospital was responsible for some portion of Michael's injuries. Dr. Aubry, contrary to plaintiffs' expert's opinion, believed that Dr. Mayfield's decision to perform a forceps delivery was negligent. All experts agreed that one-third of Michael's injuries were attributable to the forceps delivery. On cross-examination, Dr. Aubry did admit that some of Michael's injuries occurred after 5:20 p.m. However, evidence was presented that the American College of Obstetrics and Gynecology only required hospitals to be able to perform a cesarean section within 30 minutes after an order is given. It was the hospital's theory that its staff would have been ready within 30 minutes from Dr. Mayfield's 5:20 order to perform a cesarean section and, thus, the hospital was not negligent and not responsible for any of Michael's injuries. While there is some support in the record for defendant's theory of sole proximate cause, in the instant case the issues instruction setting out the hospital's affirmative defense of sole proximate cause was misleading and was an inaccurate statement of the law.

An issues instruction tells the jury what points are in controversy between the parties and thereby simplifies their task of applying the law to the facts. (Illinois Pattern Jury Instructions, Civil, No. 20.00, Introduction at 20—4 (3d ed. 1989) (IPI Civil 3d).) The issues instruction should inform the jury of the issues raised by the pleadings in a clear and concise manner, which can be accomplished by a summary of the pleadings, succinctly stated without repetition and undue emphasis. (*Signa v. Alluri* (1953), 351 Ill. App. 11, 19-20, 113 N.E.2d 475, 479.) Here, the issue instruction included the following:

"The Defendant also sets up the following Affirmative Defense. That Dr. William Mayfield was negligent in one or more of the following ways and his negligence was the sole proximate cause of Michael Ruesch's injuries:

A. Dr. William Mayfield failed to perform a cesarean section on the afternoon of February 3, 1987, at a time when he as an obstetrician/gynecologist knew or should have known such an operation was necessary for the health and well being of Michael Ruesch.

B. Dr. William Mayfield failed to specifically advise the staff of the Richland Memorial Hospital operating room to remain on the premises and not leave at their regularly scheduled time.

The Plaintiffs deny that any claimed act or omission on the part of Dr. William Mayfield was the sole proximate cause of the injuries to Michael Ruesch."

All experts agreed that Dr. Mayfield was negligent in not performing a cesarean section by 3 p.m. on February 3. Unquestionably, Dr. Mayfield's negligence in not performing a cesarean section at this time was a proximate cause of Michael's resulting injuries. It is well settled, however, that there may be more than one proximate cause of an injury. (*Windeguth v. National Super Markets, Inc.* (1990), 201 Ill. App. 3d 35, 558 N.E.2d 548.) Nevertheless, defense counsel argued that had Dr. Mayfield performed a cesarean section at 3 p.m., the situation which arose at 5:20 would never have been reached, making Michael's injuries totally attributable to Dr. Mayfield. The issues instruction on the hospital's affirmative defense, specifically section A, is a summation of this theory, and it is clearly wrong, because:

" '[P]roximate cause' [is] any cause which, in natural or probable sequence, produced the injury complained of. It need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury." (IPI Civil 3d No. 15.01.)

We believe the trial court erred in giving the affirmative defense issue instruction which misstated the law and allowed the jury to find that the hospital was not negligent if "Dr. William Mayfield failed to perform a cesarean section on the afternoon of February 3, 1987, at a time when he as an obstetrician/gynecologist knew or should have known such an operation was necessary for the health and well-being of Michael Ruesch." Since all experts agreed that Dr. Mayfield should have performed a cesarean section by 3 p.m., the jury had no choice but to find for the hospital. The instruction was clearly prejudicial.

After reviewing the record as a whole, we agree with plaintiffs that by refusing to strike the hospital's affirmative defense of sole proximate cause and giving the misleading issues instruction on the affirmative defense of sole proximate cause, undue emphasis was placed on defendant's theory that Dr. Mayfield was the sole proximate cause of Michael's injuries, especially since Dr. Mayfield was no longer a party to this suit and could easily be made the scapegoat. The jury's attention was distracted from the simple issue of whether the hospital was negligent and whether that negligence was a cause in part of Michael's injuries. Accordingly, we believe plaintiffs are entitled to a new trial. Because of our determination on

the sole proximate cause issue, we need not address the other issues raised by plaintiffs.

For the foregoing reasons, the judgment of the circuit court of Richland County is reversed and the cause remanded for a new trial.

Reversed and remanded.

LEWIS, P.J., and CHAPMAN, J., concur.