SARAH ANN FREEMAN, by and through her Father and Next Friend, Scott Freeman, *et al.*, Plaintiffs-Appellants, v. DENNIS J. PETROFF, Defendant-Appellee.

Fifth District   No. 5—94—0508

Opinion filed October 6, 1995.

Joseph L. Bauer, Jr., and Michael L. Nepple, both of Bauer & Baebler, of St. Louis, Missouri, for appellants.

Ray Freeark, of Freeark, Harvey, Mendillo, Dennis, Wuller & Buser, of Belleville, for appellee.

JUSTICE GOLDENHERSH delivered the opinion of the court:

Plaintiffs, Sarah Ann Freeman (hereinafter Sarah Ann), a minor, by and through her father and next friend, Scott Freeman, and Scott Freeman and Lisa Freeman, Sarah Ann's parents, appeal from a judgment of the circuit court of Madison County entered on a jury verdict in favor of defendant, Dr. Dennis J. Petroff. On appeal, plaintiffs' principal contentions are that (1) the trial court erred in giving the second paragraph of Illinois Pattern Jury Instructions, Civil, No. 12.04 (3d ed. 1989) (hereinafter IPI Civil 3d No. 12.04) and (2) the erroneous instructions were seriously prejudicial to plaintiffs. We reverse and remand for a new trial. A detailed recitation of all facts is not necessary since our resolution of this appeal focuses exclusively on the sole-proximate-cause jury instruction issue raised by plaintiffs. The relevant facts include the following.

I

Plaintiff Lisa Freeman's first obstetrical visit with defendant occurred on October 27, 1987. Lisa remained under defendant's care until the premature birth of her daughter, Sarah Ann, on March 23, 1988. No problems were noted during Lisa's obstetrical visits, and her pregnancy seemed to be proceeding normally as of February 27, 1988, the date of her last scheduled visit.

During the first week of March, Lisa began experiencing excess swelling of her ankles, hands, and face in the morning. She reported these symptoms to defendant's office personnel. Defendant's office told Lisa to pick up a salt-free or low-sodium diet at defendant's office. However, Lisa's condition worsened, and she began to experience nausea, vomiting, and headaches. She reported these symptoms to defendant, who recommended an antacid and Tylenol. No one from defendant's office advised Lisa to come into the office to be examined.

Because her symptoms had not improved, Lisa went to defendant's office on Monday, March 21, 1988. Lisa was unable to provide a urine sample. It is disputed whether defendant or his staff weighed Lisa and took her blood pressure during this visit. Lisa returned to defendant's office the following day, March 22, 1988. Lisa was weighed, her blood pressure was taken, and a urine sample was provided. Lisa's blood pressure was 160/110, her urine protein level was 4+, and she had gained 17 pounds. Lisa was admitted to Anderson Hospital in Maryville that same afternoon. She remained at Anderson Hospital until Wednesday afternoon, when she was transferred by ambulance to the high-risk pregnancy center at Jewish Hospital in St. Louis, Missouri.

At Jewish Hospital, Dr. Michael Nelson diagnosed Lisa as having severe preeclampsia, requiring delivery of the baby. Immediately following delivery, doctors from Children's Hospital stabilized Sarah Ann and transferred her to Children's Hospital. At birth, Sarah Ann had a gestational age of 28 weeks and was approximately nine weeks premature. Sarah Ann remained at Children's Hospital from birth to June 20, 1988. During her hospitalization, Sarah Ann underwent four ultrasound tests of the head. The first three ultrasounds were normal. However, the last ultrasound taken on June 16, 1988, showed multiple cystic areas in the periventricular regions bilaterally, which is classic for periventricular leukomalacia.

Upon discharge from Children's Hospital, Sarah Ann was diagnosed with a number of medical problems common to premature infants. Sarah Ann's most significant diagnosis is periventricular leukomalacia, which placed her at risk for developing significant motor deficits, including spastic diplegia. Later, Sarah Ann was diagnosed

as having a fairly severe type of cerebral palsy called spastic cerebral palsy. This condition has severely compromised Sarah Ann's ability to use her muscles. Sarah Ann has some use of her right upper extremity; however, it is not normal. Her left upper extremity is almost useless, and both her legs are kept extended so she cannot sit properly and has no postural balance. Sarah Ann must be propped up when in a sitting position so that she does not fall backwards or to the side. With surgery, Sarah Ann may be able to do some walking, but she will never be able to walk normally. Sarah Ann's disabilities are permanent.

At trial, plaintiffs and defendant called a number of expert witnesses. Defendant testified on his own behalf. The various expert witnesses, excluding Dr. Michael Maurer, testified concerning the signs and symptoms of preeclampsia, the care rendered by defendant, Sarah Ann's condition at birth, her subsequent problems, and her future prognosis. None of the witnesses for either plaintiffs or defendant testified concerning a standard of care applicable to Children's Hospital or that the hospital deviated from that standard of care while Sarah Ann was under Children's Hospital's care.

Dr. Maurer, testifying on behalf of defendant as a neonatalogist, opined that the periventricular leukomalacia from which Sarah Ann suffered was the result of inadequate blood flow to the brain. He stated that there were three different occasions during which Sarah Ann experienced low blood pressure while under the care of the medical staff at Children's Hospital. According to Dr. Maurer, these events set the stage for periventricular leukomalacia to occur. On cross-examination, Dr. Maurer admitted that he could not say that any of these episodes of low blood pressure, individually, caused periventricular leukomalacia. Rather, he opined that one or a combination of them caused Sarah Ann's injury. Dr. Maurer did not testify concerning an applicable standard of care that Children's Hospital owed to Sarah Ann, nor did he testify about how the hospital or its medical staff deviated from the applicable standard in their treatment of Sarah Ann.

At the close of all the evidence, the trial court tendered to the jury defendant's instruction 2, which was based on the long form of IPI Civil 3d No. 12.04. The jury returned a verdict in favor of defendant. Plaintiffs' post-trial motion for a new trial was denied. Plaintiffs appeal.

## II

Plaintiffs contend that the trial court erred when it tendered defendant's jury instruction number 2, which consisted of both

paragraphs of IPI Civil 3d No. 12.04. Plaintiffs assert that IPI Civil 3d No. 12.04 was given erroneously because the notes on the use of the second paragraph of IPI Civil 3d No. 12.04 state that it is to be given only where there is evidence tending to show that the sole proximate cause of Sarah Ann's injury was the conduct of a third person who was not a party to the suit. Plaintiffs emphasize that there was no evidence adduced at trial tending to show that the sole proximate cause of Sarah Ann's injury was the negligent conduct of someone other than defendant. Thus, the trial court was precluded from giving the second paragraph of IPI Civil 3d No. 12.04.

IPI Civil 3d No. 12.04, which relates to concurrent negligence as the proximate cause of injury, reads as follows:

> "12.04 Concurrent Negligence Other Than Defendant's
>
> More than one person may be to blame for causing an injury. If you decide that a [the] defendant[s] was [were] negligent and that his [their] negligence was a proximate cause of injury to the plaintiff, it is not a defense that some third person who is not a party to the suit may also have been to blame.
>
> [However, if you decide that the sole proximate cause of injury to the plaintiff was the conduct of some person other than the defendant, then your verdict should be for the defendant.]"

The notes on the use of IPI Civil 3d No. 12.04 state:

> "This instruction should be used only where *negligence* of a person who is not a party to the suit may have concurred or contributed to cause the occurrence. This instruction may not be used where the third person was acting as the agent of the defendant or the plaintiff. Where two or more defendants are sued and one or more may be liable and others not liable, use IPI 41.03.
>
> The second paragraph should be used only where there is evidence tending to show that the sole proximate cause of the occurrence was the conduct of a third person." (Emphasis added.) IPI Civil 3d No. 12.04, Notes on Use, at 12—9.

In analyzing IPI Civil 3d No. 12.04, the instructions are to be read as a series and considered in their entirety. (*Friedman v. Park District of Highland Park* (1986), 151 Ill. App. 3d 374, 389, 502 N.E.2d 826, 837.) The language of the first paragraph of the instruction instructs the jury to consider not only whether the defendant's conduct was negligent but also whether his negligent conduct was the proximate cause of the plaintiff's injury. (*Miyatovich v. Chicago Transit Authority* (1969), 112 Ill. App. 2d 437, 443, 251 N.E.2d 345, 348.) Only when the jury determines that the defendant's negligent conduct was a proximate cause of the plaintiff's injury may it disregard the defense that a third party's negligence was the sole proximate cause of the occurrence.

"[The second paragraph was added] to correct any negative implications arising from the first paragraph of the instruction and to insure that the jury is properly instructed in cases where *the negligence of some third person* \*\*\* is presented as a defense \*\*\* [and] to emphasize that the jury must find for the defendant where they find that the conduct of that third person was the sole proximate cause of the injury." (Emphasis added.) *Miyatovich*, 112 Ill. App. 2d at 443-44, 251 N.E.2d at 348.

As indicated by the instruction, where the conduct of a nonparty is presented as a defense, the third person's conduct must be both negligent and the proximate cause of the plaintiff's injury in order to give the second paragraph of IPI Civil 3d No. 12.04.

The "Notes on Use" reinforce this reading of IPI Civil 3d No. 12.04. The first paragraph clearly states that the instruction is to be used only where the negligence of a nonparty may have contributed to cause the occurrence. The second paragraph, read in conjunction with the first, provides that the second paragraph of the instruction should be used only where the evidence tends to show that the third person's negligent conduct was the sole proximate cause of the occurrence.

As suggested by the "Notes on Use," the entire instruction is used properly where there is some evidence adduced at trial that the negligent conduct of a third party was the sole proximate cause of the injury. When there is insufficient evidence to support the theory that a nonparty's negligence was the sole proximate cause of the occurrence, tender of the second paragraph of IPI Civil 3d No. 12.04 to the jury is improper. *Ballweg v. City of Springfield* (1986), 114 Ill. 2d 107, 121, 499 N.E.2d 1373, 1379 (Illinois Pattern Jury Instructions, Civil, No. 12.04 (2d ed. 1971) (IPI Civil 2d No. 12.04), identical to IPI Civil 3d No. 12.04).

*Storm v. Brown* (1973), 15 Ill. App. 3d 29, 303 N.E.2d 42, is instructive on this point. In *Storm*, the plaintiff's decedent was a passenger in a pickup truck owned and operated by his employer, Reid Storm. The Storm vehicle was traveling south along a road toward an unmarked intersection with an east-west road. The defendants' tractor-trailer truck was traveling in an easterly direction approaching the intersection. Both drivers' views on both roads were obstructed by mature corn plants. The collision occurred in the middle of the intersection when the Storm pickup truck struck the side of the tractor-trailer.

The evidence established that the pickup truck left 36 feet of skid marks measured to the center of the intersection and that the tractor-trailer left 24 feet of skid marks. The *Storm* court stated: "[T]here is

ample evidence to allow a jury to find that defendant's vehicle either entered the unmarked intersection before the Storm vehicle or at approximately the same time. If such were the case, it may have been incumbent upon Reid Storm to yield the right of way to defendants' vehicle, which was to his right." (*Storm*, 15 Ill. App. 3d at 33, 303 N.E.2d at 44.) Accordingly, the court held that there was ample evidence supporting a jury instruction that included the second paragraph of IPI Civil 2d No. 12.04 because the defendants raised the negligent conduct of the driver of the pickup truck, Reid Storm, as the sole proximate cause of the plaintiff's decedent's death. The *Storm* court, in ruling that the second paragraph of IPI Civil 2d No. 12.04 was applicable to the facts before it, clearly analyzed the third party's conduct through the prism of negligence in determining that there was sufficient evidence of Reid Storm's negligent conduct to warrant inclusion of the sole-proximate-cause paragraph in the jury instructions.

■ In a suit for medical malpractice a party must establish a standard of care, a deviation from that standard, and a causal connection between the deviation and the injuries sustained. (*Evanston Hospital v. Crane* (1993), 254 Ill. App. 3d 435, 441, 627 N.E. 2d 29, 34; *Gruse v. Belline* (1985), 138 Ill. App. 3d 689, 486 N.E.2d 398 (attorney's failure to exercise reasonable degree of care and skill must be established through expert testimony); *St. Gemme v. Tomlin* (1983), 118 Ill. App. 3d 766, 455 N.E.2d 294 (expert testimony required not only as to negligence of dentist but also as to proximate causal connection between negligence and injuries sustained by plaintiff).) The standard of care applicable to a hospital may be proven via licensing regulations, accreditation standards, hospital bylaws, and expert testimony. (*Roberts v. Sisters of St. Francis Health Services, Inc.* (1990), 198 Ill. App. 3d 891, 903, 556 N.E.2d 662, 666; *Northern Trust Co. v. Upjohn Co.* (1991), 213 Ill. App. 3d 390, 408, 572 N.E.2d 1030, 1042.) Establishing a standard of care is crucial because it serves as a guide by which to judge conduct in a particular situation. (*Kemnitz v. Semrad* (1990), 206 Ill. App. 3d 668, 673, 565 N.E.2d 1, 3.) "Where there is an insufficient evidentiary basis to give an instruction on an issue in a medical malpractice case, it would be reversible error to give such an instruction." *Kemnitz*, 206 Ill. App. 3d at 673, 565 N.E.2d at 4.

In the case at bar, defendant alleges that a nonparty to the suit, namely Children's Hospital, is the sole proximate cause of Sarah Ann's injury and is therefore liable. To determine whether the second paragraph of IPI Civil 3d No. 12.04 is applicable to this case, there must be some evidence tending to show that the third party's conduct

was the sole proximate cause of Sarah Ann's injury. (IPI Civil 3d No. 12.04; *Ballweg v. City of Springfield* (1986), 114 Ill. 2d 107, 121, 499 N.E.2d 1373, 1379.) Because this case involves the alleged malpractice of a third party, defendant must establish, through expert testimony, the generally accepted standard of care for the particular situation, a deviation from that standard, and a causal connection between the third party's deviation and plaintiff's injury. It is essential to establish the applicable standard of care against which the third party's conduct is to be measured. Without a standard to serve as a guide, there is no basis by which to determine whether there is a sufficient evidentiary basis to give an instruction which includes the second paragraph of IPI Civil 3d No. 12.04. Where, as here, a party fails to establish a standard of care and demonstrate the third party's deviation from the standard, the evidentiary basis for giving the second paragraph of IPI Civil 3d No. 12.04 is insufficient. Consequently, it would be reversible error to give such an instruction. *Ruesch v. Richland Memorial Hospital* (1994), 260 Ill. App. 3d 49, 58, 632 N.E.2d 658, 663.

We now turn to consideration of the issues raised by the instant appeal. Plaintiffs assert that Dr. Maurer's testimony failed to establish a medical standard of care applicable to the care rendered to Sarah Ann by Children's Hospital's medical staff, a deviation from that standard by Children's Hospital's medical staff, and a causal connection between the deviation and the injuries sustained by plaintiff.

Dr. Maurer made the statements at issue here during direct examination by counsel for defendant:

"Q. Tell the jury generally what you did, what you analyzed and what you concluded by going through all these records.

A. I went through all the records, in particular, the Children's Hospital record, in order to see if I could detect any time periods in which there—the setting existed in which there could have been an impairment or reduction of blood flow to the brain, since I was concerned that the major form of injury that this baby had was the periventricular leukomalacia, knowing that it is a low blood flow phenomena or is believed to be a low blood flow phenomena.

\* \* \*

Q. What did you find?

A. There were three different times in particular that I was concerned about.

Excuse me. The first time was really right as the infant was being transferred from Anderson Hospital to Children's Hospital.

Q. From Jewish Hospital to Children's Hospital?

A. From Jewish Hospital to Children's Hospital. So it would involve the transport team from Children's Hospital, picking up the infant. *** They documented a couple of pressures in their—in the period of time before they left for—with the infant to Children's Hospital that were just frankly subnormal for this baby's age. They were in the 30's. This is kind of a theme about the kinds of things that occurred and the level that I was concerned about later on in the hospitalization as well.

At any rate, there was a documentation at that point in time of a couple of blood pressures down in the 30's. That is below the level that it should be for a baby of this gestational age.

* * *

Q. What could have been done?

A. Well, in that situation, it would have been nice I think to see an acknowledgement that those were pressures that were worrisome and the infusion of some sort of volume expander or something to address why that might have occurred. If the use of a therapy like a volume expander—meaning something you can infuse like saline into the venous system in order to expand the blood volume and bring the pressures back up.

* * *

Q. Can you give any medication which might assist under these circumstances like that?

A. Yeah, you wouldn't start with the medication. You would start with adjusting anything that might be impacting the blood pressure in an adverse way ***. If that didn't help, you would add the addition of some fluid to expand the blood volume so the baby could more effectively pump and keep the pressure up. If that didn't work, there are a number of medicines that basically act by strengthening the beat of the heart. They make the muscle stronger. And they are given as a—generally given as a continuous infusion into the intravenous system, these medicines like Dopamine and Dobutamine, fancy names, that basically are there just to act to strengthen the heart beat. And that strengthening the heart beat is a very effective way in general of increasing the blood pressure in these infants.

Q. And there's no evidence any of that was done?

A. Not in that situation, no.

Q. Now, go ahead then, Doctor, and talk about whatever the instances you discovered.

A. Right. So I was concerned about that one, because it had the potential for having a rather prolonged period of inadequate blood flow and inadequate blood pressure. I looked through the rest of

the record. It looks like things went relatively well, but there was the suspicion—I think it was around 3/26—that there was a significant patent ductus arteriosus, this peculiar little vessel that should have closed that didn't.

They began to suspect that because of some instability that the baby was having. I think he had some physical, or she had some physical signs to suggest that as well.

\* \* \*

They did a test to look for the presence of that, that open vessel, which was echocardiogram, an ultrasound of the heart. \*\*\* Didn't detect any of that initially but still had a lot of clinical signs that there was probably the presence of this blood stealing away from the systemic circulation, right on out until they finally diagnosed that condition I think in the first part of April, and then went ahead, tried to treat it with a medicine called Indomethacin, which is a way of closing, stimulates the muscle that should have closed to close. Didn't work in this particular situation, which happens, and they were—felt that they had no other choice then but to go ahead and to take the baby to surgery and tie the vessel off. \*\*\* I felt like—you know, again, I wasn't managing the patient, but I felt like this was a period of time where the setting for reduction of blood flow to the brain was very critical, could easily have occurred during that period, and in particular was concerned about it since it was a severe enough ductus for them to go ahead and do something that we do maybe in two percent of all the kids we diagnose with a ductus, which was to go ahead and ligate the ductus, to tie it off.

Q. What else did you find, Doctor?

A. The third area I was concerned about was the—was really around that same time, and it seemed like during the surgery things went okay. After surgery, when she came back, there was another period of documented what I call hypotension or inadequate blood pressure, again down in the 30's. \*\*\*

They—there wasn't any clear chronology in terms of the amount of time that she was actually with that low pressure, but they had enough time to give her ten cc's, which is about what, two teaspoons, per kilogram. \*\*\* So they gave her a volume expander as I talked about in order to get her pressure. So they did what was appropriate in that situation. It didn't work. And her pressures were still down, and by the time she got back into the newborn ICU, the attending there chose to give her another forty, I believe, thirty to forty cc's per kilo, so three to four times the usual initial response to get her pressure up in order to get her pressure up. That didn't work very well and he started her on

some Dopamine as well, kind of the sequence of events that we have gone through in terms of what you do to treat hypotension in these babies.

\* \* \*

Q. And was there anything else that you noticed during the hospitalization that you felt could have brought about this reduced blood flow?

A. Not—not—nothing that occurred during the neonatal hospitalization specific to a potential cause for the periventricular leukomalacia.

Q. Nothing more as to the periventricular leukomalacia, PVL?

A. Right. Right."

On cross-examination of Dr. Maurer by plaintiffs' counsel, the following colloquy took place:

"Q. All right. What I am getting at, though, as you sit here today, you cannot say to a reasonable degree of medical certainty that the thirty minutes or so of low blood pressure shortly after Sarah was born caused the periventricular leukomalacia, can you?

A. In isolation?

Q. Yes, by itself.

A. No.

\* \* \*

Q. You cannot say that the existence of the condition of the patent ductus arteriosus by itself caused the periventricular leukomalacia?

A. Not in isolation, no.

Q. And by the same token, you cannot say that the existence of the period following the surgery for the PDA where the blood pressure was low caused the periventricular leukomalacia?

A. Right, that's the same.

\* \* \*

Q. You testified, and I want to make sure that I understand your testimony, that concerning the low blood pressure after surgery, that the Children's Hospital, the neonatologist and the staff there you felt acted appropriately by giving the various medications that they did?

A. Uh-hum."

■ Dr. Maurer's testimony is devoid of a generally accepted medical standard of care, fails to state how the medical staff at Children's Hospital deviated from the standard, and does not establish a causal connection between Children's Hospital's alleged deviation and Sarah Ann's injury.

During direct examination, Dr. Maurer testified that there were three occasions when plaintiff experienced low blood pressure, which Dr. Maurer believes is related to plaintiff's injury, periventricular leukomalacia, which is associated with low blood flow to the brain.

The first of these occasions of low blood pressure occurred in the period immediately following Sarah Ann's birth and her transfer to Children's Hospital. Dr. Maurer testified that there were a couple of documented blood pressures in the 30's. Regarding these instances of low blood pressure, Dr. Maurer stated that "it would have been nice I think to see an acknowledgement that these were pressures that were worrisome." Dr. Maurer's statement is an expression of his own personal preference rather than an accepted standard of medical care to which the Children's Hospital's medical staff are required to adhere. The only testimony given by Dr. Maurer that comes close to addressing the existence of a standard of care is his discussion of the various methods for treating low blood pressure in premature newborns. Absent from Dr. Maurer's testimony is what the generally accepted standard of care is for transporting a premature newborn in Sarah Ann's condition to another medical facility. Here, there is no testimony from Dr. Maurer indicating that the care rendered by Children's Hospital during the periods Sarah Ann experienced low blood pressure clearly deviated from what is considered proper care by the medical community in this particular circumstance.

According to Dr. Maurer, two other situations existed that could have contributed to low blood flow to the brain, giving rise to periventricular leukomalacia. These include the presence of patent ductus arteriosus and a drop in Sarah Ann's blood pressure shortly after the surgery to correct the patent ductus arteriosus. Dr. Maurer opined that during the surgery to ligate the ductus, "things went okay." Concerning the low blood pressure after surgery, Dr. Maurer testified that the neonatologist and the staff at Children's Hospital acted appropriately in treating Sarah Ann's low blood pressure. With respect to the aforementioned situations, at no time did Dr. Maurer state that the medical staff at Children's Hospital deviated from an accepted medical standard of care or skill.

Moreover, on cross-examination, Dr. Maurer was unable to state to a reasonable degree of medical certainty which one of these events could have caused the periventricular leukomalacia. Instead, he opined that a combination of these events could have caused a reduced blood flow to the brain.

In light of the facts presented here, we conclude that there was an insufficient evidentiary basis to support giving a jury instruction that the sole proximate cause of the occurrence was a third party's

conduct. Accordingly, the trial court erred in giving an instruction containing the second paragraph of IPI Civil 3d No. 12.04.

### III

Plaintiffs next contend that the erroneous instruction was prejudicial because it distracted the jury's attention from the issue of whether defendant was negligent and placed undue emphasis on defendant's unsupported theory that Children's Hospital was the sole proximate cause of Sarah Ann's injury. We agree.

A court must instruct a jury on all issues reasonably presented by the evidence. (*Ruesch*, 260 Ill. App. 3d at 58, 632 N.E.2d at 663.) "As a general rule, a new trial should be granted for improper jury instructions only where the opposing party has suffered serious prejudice from the offending instruction." *Thompson v. MCA Distributing, Music Corp.* (1994), 257 Ill. App. 3d 988, 991, 629 N.E.2d 206, 208.

■ Here, plaintiffs were seriously prejudiced. Defendant failed to establish, through Dr. Maurer's testimony, a medical standard of care, a deviation from that standard on the part of Children's Hospital, and sufficient causation evidence of sole proximate cause. By giving the jury erroneous instructions, the jury lacked a full and fair statement of the law to guide their deliberations and lacked a sufficient evidentiary basis upon which to properly apply the law. Because the erroneous instruction affected the jury's understanding of the issue of sole proximate cause and thereby affected the ultimate determination of liability, we hold that plaintiffs were seriously prejudiced by the improper instruction and deprived of a fair trial. Accordingly, plaintiffs are entitled to a new trial.

For the foregoing reasons, the judgment of the circuit court of Madison County is reversed, and the cause is remanded for a new trial.

Reversed and remanded.

HOPKINS and KUEHN,[1] JJ., concur.

---

[1]Justice Lewis, originally one of the panel members on this case, retired effective August 1, 1995; Justice Kuehn was assigned to this case in substitution for Judge Lewis.